120 F.3d 965
 97 Cal. Daily Op. Serv. 5742, 97 Daily Journal
D.A.R. 9229
Jimmy LISTON; Venice Liston; Danny Liston; Andrew Liston;
Elishia Liston, minors, by and through their
Guardian ad Litem, Jim Liston,
Plaintiffs-Appellants-Cross-Appellees,
v.
COUNTY OF RIVERSIDE, a political subdivision of the State of
California; David Pike; D. Podkowa, Defendants-Appellees,
and
Paul Amicone, Police Officer; Bart Belknap, Deputy; Gail
Marianes, Deputy; John Powell, Deputy; Robert Pruitt;
Danny Scaturro, Detective; Raymond Rucker, Lieutenant; Tom
Mitchell, Police Officer; Darrell Reed, Police Officer,
Defendants-Appellees-Cross-Appellants.
 Nos. 94-56584, 94-56615.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 8, 1996.
Decided July 21, 1997.
As Amended Oct. 9, 1997.
 
 Devonne L. Daley, Klass, Helman & Ross, Los Angeles, CA, for Plaintiffs-Appellants-Cross-Appellees.
 Marcus M. Kerner, Assistant United States Attorney, Santa Ana, CA, for Defendant-Appellee David Pike.
 Ann M. Maurer, Franscell, Strickland, Roberts & Lawrence, Pasadena, CA, for Defendants-Appellees-Cross-Appellants Paul Amicone, et al.
 Appeal from the United States District Court for the Central District of California; Gary L. Taylor, District Judge, Presiding. D.C. No. CV-93-0488-GLT.
 Before: REINHARDT, HALL and LEAVY, Circuit Judges.
 
 
 1
 Opinion by Judge REINHARDT and Judge HALL; Dissent by Judge REINHARDT.
 
 
 2
 REINHARDT, Circuit Judge (except as to Section B.3); CYNTHIA HOLCOMB HALL, Circuit Judge (as to Section B.3).
 
 
 3
 Early in the morning on March 29, 1991, law enforcement officers armed with a search warrant raided a small, single-story private residence at 8293 Saddlecreek Drive, Glen Avon, California. The intended target of the search was James "Rocky" Hill, whom investigators believed to be involved in a large-scale methamphetamine manufacturing and distribution network. Unfortunately, for everyone involved, at the time the warrant was executed Hill no longer resided at the Saddlecreek Drive address. Plaintiffs-appellants, Jim and Venice Liston, had bought the house from him and, with their three minor children, Danny, Andrew, and Elishia, had moved into it three days earlier. According to the Listons, the officers who conducted the search broke down the front door with a battering ram, tackled and injured Jim Liston, ransacked the house and yard, willfully destroying property, and detained the entire family for approximately an hour and a half, well beyond the time when it had become apparent that they had made a serious mistake.
 
 
 4
 The Listons brought an action under 42 U.S.C. § 1983, Bivens,[1] and state law, alleging constitutional deprivations resulting from the conduct of the officers in obtaining and executing the search warrant. A number of individual defendants moved for summary judgment on the ground of qualified immunity. The district court first granted summary judgment as to all moving officers, excluding Federal Task Force Officer David Pike, and subsequently granted summary judgment in Pike's favor as well. The Listons appeal from both of the orders. Because we conclude that genuine issues of material fact preclude an award of summary judgment to most of the defendant officers, we reverse as to them, affirm as to the others, and remand to the district court for further proceedings.
 
 I. FACTS
 A. Obtaining the Warrant
 
 5
 Beginning approximately in December of 1989, officers from several law enforcement agencies, under the control of the Federal Drug Enforcement Agency, formed a joint narcotics task force and began an investigation into a large-scale methamphetamine manufacturing and distribution network in the San Bernardino and Riverside counties area. This extensive investigation, covering a wide geographical area and involving numerous suspects, continued into March of 1991. Relying on information obtained by the task force, Magistrate Judge Charles Eick issued a warrant on March 26, 1991, authorizing officers to search thirteen separate locations, including 8293 Saddlecreek Drive.
 
 
 6
 Defendant Danny Scaturro, a senior deputy with the San Bernardino Sheriff's Department, served as lead investigator on the task force. In that capacity, he was responsible for obtaining and compiling information from all other team members. In addition, it was Deputy Scaturro who prepared the affidavit and the request for the search warrant at issue in this case. The task force had linked Hill to the methamphetamine network through direct officer surveillance, financial records, and the reports of a number of citizen informants. Accordingly, Scaturro's warrant application sought authorization to search 8293 Saddlecreek Drive, the address at which Hill resided during at least some portion of the time in question.[2] In his affidavit, Deputy Scaturro offered the following evidence linking Hill to the Saddlecreek Drive address:
 
 
 7
 Through utility records, surveillance conducted [sic] members of my team, and through Department of Motor Vehicles [sic], I have determined that JAMES ROCKY HILL lives at 8293 Saddle Creek Drive, Glen Avon, California. HILL has been followed from Highland Towing to this location on several occasions, and have [sic] also been followed from this location to Highland Towing.
 
 
 8
 The affidavit contains no further information linking 8293 Saddlecreek Drive to the activities under investigation by the task force, and provides no dates on which any of the investigative activities or observations set forth above occurred.
 
 
 9
 According to the declaration he submitted in support of defendant's motion for summary judgment, at some point prior to preparing and presenting the warrant application Deputy Scaturro drove by the Saddlecreek residence in order to verify the address and to get a description of the premises to guide the officers executing the search.[3] Scaturro included the following description in his search warrant affidavit:
 
 
 10
 This is a single story residence located on the south side of Saddle Creek Drive, southwest of the intersection with Galena Street. The structure is further described as being tan in color with blue trim and having a brown in color composition shingle roof. The number "8293" are stenciled on the curb in front of the residence in four inch high black letters on a white background. The front door is oriented toward the north and is directly to the left of an attached two-car garage. The front of the garage is finished in imitation stone that is tan in color.
 
 
 11
 The Listons, in the declarations they filed in opposition to defendants' summary judgment motions, contend that a "large and typical real estate 'for sale' sign," had been posted on the lawn for at least ninety days before they moved into their new home. The Listons further assert that for at least thirty days before they moved in, a "Sold" sign was affixed to the "For Sale" sign. Scaturro did not mention either the "For Sale" sign or the attached "Sold" sign in the affidavit that accompanied the warrant application. In his subsequent summary judgment declaration, Scaturro admitted that while he was at the Saddlecreek address, he observed a "For Sale" sign in the front yard. However, he rejected entirely the Listons' contention that there was a "Sold" sign: "I also observed a 'For Sale' sign in the front of the residence, but there was no 'Sold' notice on it." On March 26, the same day on which Jim and Venice Liston and their three minor children moved into their new home at 8293 Saddlecreek Drive, after a lengthy escrow period that commenced when the escrow was opened in mid-December, Magistrate Judge Eick issued the search warrant.
 
 B. Executing the Warrant
 
 12
 According to evidence offered by the defendants in their declarations and not disputed by the Listons, on the morning of March 29, 1991, Federal Task Force Officer David Pike attended a briefing session at the San Bernardino Sheriff's office concerning the drug enforcement operation that was about to commence. At the session, Pike was given a copy of the search warrant for 8293 Saddlecreek Drive and was assigned to execute the warrant. More important for present purposes, at the briefing Pike was provided with information regarding the intended target of the search, James Rocky Hill. He was informed that Hill was connected to a methamphetamine drug trafficking and precursor chemical brokering operation throughout San Bernardino, Riverside, and Los Angeles counties. According to his declaration, Pike was further informed that Hill "was a very violent individual, that he had posed as an FBI Agent, he was armed a majority of the time, there was information that he would resist being taken into custody, and that he may shoot it out with police."[4]
 
 
 13
 When the search team--which, according to the investigation report filed later, consisted of fifteen officers--arrived at the Saddlecreek residence shortly after 7:00 a.m., Agent Pike knocked on the door, announced the police presence, and demanded entry. He waited about a minute and then knocked again and repeated his announcement. Pike reports in his declaration that he "heard a male voice from behind the door say that he had to get a key and would be back." Pike asserts that he "thought the person behind the door was James Rocky Hill and that he was arming himself against us as had been detailed to us in our briefing." At that point, Pike ordered Detective Paul Amicone to break down the door with a battering ram.[5]
 
 
 14
 The officers assert that they were met by a single adult male standing inside the residence near the door dressed in running shorts and a T-shirt. Pike contends that this figure matched the physical description he had of James Rocky Hill. As Pike describes it, he then ordered the man to get down on the floor and "[w]hile on the floor officers handcuffed him." Neither Pike nor any of the other defendants who submitted declarations as evidence offer any suggestion as to who exactly was involved or what occurred between the time Liston was ordered to the floor and the handcuffs were placed on his prone body. Officer Amicone states that he while he does not recall having any physical contact with anyone, he "did stand by and watch a man handcuffed on the floor until another officer announced that the house was clear of additional suspects." Deputy Marianes says only that he "had no contact with any of the plaintiffs other than seeing them." Defendants Belknap and Pruitt assert in identical words in their separate declarations, "I do not recall seeing anyone handcuffed, and had no contact within [sic] anyone myself." Officers Mitchell and Reed state that they did not enter the premises. Deputy Powell, Lieutenant Rucker, and Deputy Scaturro contend they were never present at the scene.
 
 
 15
 The Listons, however, in the declarations they filed in opposition to defendants' motions for summary judgment, fill in the gap with a graphic description of the intervening events. They start with the police officers' demand for entry. According to Jim Liston, he went to try to retrieve the key to unlock the deadbolt. Before he was able to do so, the officers broke the door open with the battering ram. As they burst into his house, the officers yelled contradictory commands at him, ordering him simultaneously to get down and to raise his hands. Liston, "in shock" and uncertain how to respond to the conflicting demands, did not move. He asserts in his declaration that the officer closest to the front door grabbed him from behind the back of his neck and threw him down hard to the floor, injuring him.[6] Liston explicitly states that he did nothing to resist. When he hit the floor, other officers "pounced" on him: "There was at least one foot on my back and there were feet on both my hands which were on the ground." At that point, "somebody stuck a gun at the temple of my face. Again, I was doing nothing to resist what was happening." Liston asserts that approximately four officers were "making contact with him." After two or three minutes like that on the ground, Liston was handcuffed. All the while, multiple guns were aimed at him, although he does not say from where or by whom. Liston's description of how he was treated by the officers is supported by that of his wife: "I observed many persons quickly enter the house and throw my husband down to the ground." From his vantage point on the floor, Liston asserted in his declaration, he observed "many other officers going past me into various parts of my house."
 
 
 16
 Venice Liston contends that while some officers involved with her husband, others were ordering her to the ground. She yelled "you're making a mistake" and "you have the wrong house." She was dressed only in a T-shirt and her underwear. Shortly after, she was ordered to sit on a couch in the living room, where her three young children were directed to join her. She asserts that she and her children were made to remain there for the duration of the search.
 
 
 17
 The parties offer conflicting accounts of the events that occurred during the remainder of the raid. As told by Officer Pike in the declaration he submitted in support of summary judgment, while other officers secured the premises, Pike helped Liston to his feet and brought him into the kitchen/dining room area where he sat down. Liston told Pike that he was not James "Rocky" Hill. In response to a request from Pike for identification, Liston told another officer where his wallet could be found. The California Driver License the officer located identified the handcuffed man as James Liston.
 
 
 18
 Liston then informed Pike that he and his family had just moved into the house a few days before. Escrow papers that were in the house confirmed Liston's story. Pike contends that
 
 
 19
 As soon as I determined that he was in fact who he said he was I removed the handcuffs from him and asked him questions about James Rocky Hill. Two minutes elapsed while I determined that the individual was not James Rocky Hill. The search was in progress at this time. The escrow papers were found and they revealed that the residence had in fact been sold by James Rocky Hill to James Liston.
 
 
 20
 In all, according to his declaration, "[t]he total time I was in the house was ten to fifteen minutes," after which he and the other officers returned to the San Bernardino Sheriff's Office for additional assignments.
 
 
 21
 The Listons, on the other hand, assert that they were held in custody while the officers ransacked their home for approximately an hour and a half. According to the account Liston provided in his declaration, after a few minutes on the floor, injured and still handcuffed, he was lifted up and brought into the dining room/kitchen area and seated at the dining room table while the officers conducted their search. From that position he was able to see officers "going through various parts of my house, through my desk and looking through my folders and my briefcase." Liston estimated in his declaration that approximately fifteen officers were inside the residence; he further contended that the officers conducting the search "were basically and literally trashing my house." He claimed, for example, that the officers ransacked his closets and drawers, throwing items about indiscriminately, and dumped the kitchen trash on the floor.
 
 
 22
 As told by Liston, he sat at the dining room table for about 15 minutes before he was asked for any identification. Earlier, he had attempted to talk to the officers holding him, but was told, in effect, to "shut up." The officers then examined his identification as well as his wife's. Another 45 minutes elapsed prior to the time his handcuffs were removed by Officer Pike. Liston was then required to remain seated in the dining room for another thirty minutes, at which point a "senior looking officer" asked Pike something like "don't you think we have way too many officers here for what is going down." Shortly thereafter, the officers began to leave. They handed the warrant to the Listons and departed without further explanation. Liston does not state whether he mentioned the escrow papers to Pike or when they were found during the search.
 
 
 23
 In her separate declaration, Venice Liston reiterated many of the details alleged by her husband. She noted in addition that it was apparent to her that
 
 
 24
 the officers knew they were in the wrong house very shortly after they entered. They were laughing and joking. It appeared to me that they were embarrassed, so that they tried to make a joke about it. I also heard them joking about the fact that we were first time home buyers. Again, this is shortly after they entered the house.
 
 
 25
 Finally, the Listons offer undisputed allegations of significant destruction of property. In carrying out the search of their home, the Listons contend, the officers destroyed the front door, broke down the fences surrounding the backyard, dug holes in the backyard, and left garbage and the Listons' personal property littered throughout the house. The officers offer no evidence to the contrary.
 
 II. DISCUSSION
 A. Obtaining the warrant
 
 26
 The Listons argue that the district court erred in granting qualified immunity to Deputy Scaturro for his role in obtaining the warrant authorizing the search of their home. We agree and reverse.
 
 
 27
 The Listons contend that Deputy Scaturro violated their Fourth Amendment rights by omitting from his affidavit any mention of the "For Sale" and "Sold" signs posted in their front yard.[7] They claim, in essence, that the omission of these material facts misled Magistrate Judge Eick, who would not have issued the warrant had Scaturro included the information in his affidavit.
 
 
 28
 In Branch v. Tunnell, 937 F.2d 1382 (9th Cir.1991), we held that the standard for qualified immunity in a civil rights action of this type is governed by Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978): "The Franks standard, although developed in a criminal context, 'also defines the scope of qualified immunity in civil rights actions.' " Id. at 1387 (quoting Rivera v. United States, 928 F.2d 592, 604 (2d Cir.1991)). Franks established a criminal defendant's right to an evidentiary hearing when he made a showing of deliberate or reckless disregard for the truth in a search warrant affidavit and demonstrated that but for the dishonesty, the affidavit would not support a finding of probable cause. Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85.
 
 
 29
 Applying the standards set forth in Franks, we held in Branch that in a civil rights case where a claim of judicial deception is made,
 
 
 30
 if an officer 'submitted an affidavit that contained statements he knew to be false or would have known to be false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, ... he cannot be said to have acted in a reasonable manner,' and the shield of qualified immunity is lost.
 
 
 31
 Branch, 937 F.2d at 1387 (9th Cir.1991) (quoting Olson v. Tyler, 771 F.2d 277, 281 (7th Cir.1985)).
 
 
 32
 Whether the alleged judicial deception was brought about by material false statements or material omissions is of no consequence. United States v. Stanert, 762 F.2d 775, as amended, 769 F.2d 1410 (1985). In Stanert, we reasoned that by "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." Id. at 781. To allow a magistrate "to be mislead in such a manner could denude the probable cause requirement of all real meaning." Id. Accordingly, a Fourth Amendment violation occurs where "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." Id.
 
 
 33
 In Hervey v. Estes, 65 F.3d 784 (9th Cir.1995), we clarified the mechanics of a judicial deception claim and carefully spelled out the burden a plaintiff must meet in order to survive a defendant officer's motion for summary judgment on the ground of qualified immunity. We held in that case that the plaintiff must 1) make a "substantial showing" of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred. Id. at 788-89 (citing Branch, 937 F.2d at 1388). If a plaintiff satisfies these requirements, "the matter should go to trial." Id. at 789. Put another way, "the showing necessary to get to a jury in a 1983 action is the same as the showing necessary to get an evidentiary hearing under Franks." Id. (citing Snell v. Tunnell, 920 F.2d 673, 698 (10th Cir.1990)); see also, Lombardi v. City of El Cajon, 117 F.3d 1117 (9th Cir.1997).
 
 
 34
 In its order granting summary judgment, the district court concluded that the Listons failed to "demonstrate" either that the affidavit would not support probable cause if the omitted facts had been included or that Scaturro intentionally or recklessly omitted those facts.[8] We will address each conclusion in turn.
 
 
 35
 We review de novo the district court's conclusions that the alleged omissions in an affidavit are not material to a finding of probable cause. United States v. Hernandez, 80 F.3d 1253, 1260 (9th Cir.1996). In reviewing the materiality of challenged omissions, we accept as true the facts alleged by the Listons.
 
 
 36
 In the case at hand, probable cause to search the residence at 8293 Saddlecreek Drive depended entirely on the strength of the evidence that James Rocky Hill currently resided at that address. Deputy Scaturro offered no direct evidence connecting the narcotics activities under investigation to the house; instead, Scaturro set forth his opinion, based on his experience and training, that contraband and evidence of illegal drug activity will often be found at the residence of persons involved in the manufacture and distribution of methamphetamine. After demonstrating elsewhere in the affidavit that James Rocky Hill was such a person, Scaturro informed the magistrate that utility records, officer surveillance, and DMV records established that Hill lived at the house on Saddlecreek Drive. Ordinarily, Scaturro's statements, although certainly scant and conclusory, would have satisfied the probable cause requirement without need for additional information.
 
 
 37
 The question is whether our conclusion remains the same in light of the presence of the For Sale/Sold signs: "[w]e must determine ... whether the affidavit, once corrected and supplemented, would provide a magistrate with a substantial basis for concluding that probable cause existed." Stanert, 762 F.2d at 782. Given the facts that we must assume, our answer is no. We conclude here that had the additional information been contained in the affidavit the magistrate would not have issued the warrant without requiring additional information and in addition imposing specific restrictions on its execution. Properly corrected and supplemented, the sole paragraph in Scaturro's affidavit linking Hill to 8293 Saddlecreek Drive would have read as follows:
 
 
 38
 Through utility records, surveillance conducted by members of my team, and through Department of Motor Vehicles records, I have determined that JAMES ROCKY HILL lives at 8293 Saddlecreek Drive, Glen Avon, California. HILL has been followed from Highland Towing to this location on several occasions, and has also been followed from this location to Highland Towing. However, when I drove by the address a few days prior to preparing this affidavit, I observed a "For Sale" sign to which a "Sold" sign had been affixed posted in the front yard.
 
 
 39
 The For Sale/Sold signs would put a reasonable magistrate on notice that a change in occupancy would be occurring in the near future, if it had not already occurred, and that special consideration must be given both to the timeliness of the evidence supporting the warrant application and the timeliness of the execution of the warrant itself. Nowhere in the affidavit did Scaturro indicate when the information on which he relied was obtained. Utility records, officer surveillance, and DMV records might be used to establish probable cause even in the face of the For Sale/Sold signs in the front yard, if there were current information that the suspect still occupied the house at the time the warrant issued. Of additional concern is the fact that the warrant issued by the magistrate allowed the officers ten days in which to execute it. With each day that passed, the likelihood that Hill still resided at that address diminished. A reasonable magistrate presented with the omitted information would not simply have issued a warrant, let alone a form warrant with a 10-day limit. At the least, he would have required further information regarding the time of Scaturro's observation of the property and the actual or prospective change in occupancy.[9] Accordingly, we hold that the Listons have demonstrated that had the omitted facts of the For Sale/Sold signs been included the magistrate would not simply have issued the warrant without more.
 
 
 40
 Having answered the threshold issue of materiality, we turn now to the question of whether the Listons have made a "substantial showing" that Scaturro intentionally or recklessly omitted the information. While the materiality issue is one "reserve[d] to the court," Hervey, 65 F.3d at 789, if the Listons make the required "substantial showing," the question of intent or recklessness is "a factual determination for the trier of fact." Id. at 791. We have previously held that "[c]lear proof of deliberate or reckless omission is not required." Stanert, 762 F.2d at 781.
 
 
 41
 In opposing defendants' motion for summary judgment, the Listons offered the declaration of Jim Liston. In that declaration, Liston contends that for at least ninety days before moving into the Saddlecreek residence, he observed a "For Sale" sign in the front yard and that for at least thirty days before moving in, he observed a "Sold" sign affixed to the "For Sale" sign. Defendants counter with an affidavit from Deputy Scaturro in which he asserts that he observed the "For Sale" sign in the front yard, but that "[t]here was no 'Sold' notice on it."
 
 
 42
 Reviewing the evidence as we must in the light most favorable to the plaintiffs, we conclude that the Listons have made the required substantial showing that Scaturro intentionally or recklessly omitted the presence of the For Sale/Sold signs from his affidavit. Given the importance of the For Sale/Sold signs to the probable cause analysis, if Scaturro observed the signs when he drove by the Listons' house, a jury could reasonably conclude that his failure to mention them in his affidavit amounted to at least reckless disregard for the truth. Scaturro admits that he saw the "For Sale" sign posted in the Listons' front yard when he drove by their house before preparing the warrant. Based on the record before us, we conclude that a reasonable jury could find that Deputy Scaturro also observed the "Sold" sign at that time. First, in his declaration, Liston describes the For Sale/Sold sign as a large, typical real estate sign. The objective of such signs is to announce information to observers at some distance. Moreover, Scaturro was at the house for the purpose of obtaining a detailed description of the premises; indeed, this careful observer did not fail to take note of the "For Sale" sign. Accordingly, a jury could reasonably infer that Scaturro observed the "Sold" sign, which, for present purposes, we must assume to have been affixed to the sign Scaturro admittedly observed. Viewing the evidence in the light most favorable to the Listons, we are simply unable to say that a reasonable jury could not find in their favor.
 
 
 43
 Because we conclude that the Listons have made a sufficient showing of deliberate or reckless dishonesty and have established the materiality of the omitted fact, we conclude that summary judgment on qualified immunity grounds was improperly awarded to Deputy Scaturro with respect to the obtaining of the warrant. We therefore reverse the decision of the district court's summary judgment order as to him.
 
 B. Executing the warrant
 
 44
 Law enforcement officers enjoy qualified immunity from civil damage claims unless their conduct violates "clearly established constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Determining whether a public official is entitled to qualified immunity "requires a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official believe his conduct lawful?" Act Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir.1993). "A public official is not entitled to qualified immunity when the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." Osolinski v. Kane, 92 F.3d 934, 936 (9th Cir.1996) (alterations in the original) (internal quotations omitted).
 
 
 45
 While we have held that qualified immunity is to be determined "at the earliest possible point in the litigation," Act Up!, 988 F.2d at 873, we have also held that summary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits. Id. Moreover, "if the facts alleged by the defendant officer could not support a reasonable belief that his conduct was lawful, he is not entitled to qualified immunity." Id.
 
 
 46
 The Listons allege three separate constitutional deprivations arising out of the officers' conduct in executing the search warrant. First, the Listons contend that the force used initially to subdue and restrain Jim Liston was excessive. Second, they argue that they were unlawfully detained while the officers conducted the search, asserting that the length of time they were detained and the manner in which the detention was carried out rendered the detention unreasonable. Finally, the Listons claim that the officers conducted the search itself in an unreasonable manner, in effect ransacking the home and callously and needlessly destroying property.
 
 
 47
 In two separate orders, the district court granted summary judgment to all moving officers as to each of the Listons' claims. In the first order, filed June 3, 1994, the court granted qualified immunity to all moving defendants except Task Force Officer Pike. In the second, filed September 28, 1994, it did so with respect to Pike. As to plaintiffs' claim that Jim Liston was subjected to excessive force, the district court concluded in its June order that, based on the information available to the officers at the time, "they could reasonably have believed that the force they used was necessary to subdue [Liston] and to detain him pending a search of the premises." As to the Listons remaining claims, in its June order, the court concluded that the evidence "raise[d] triable issues regarding how long plaintiffs were detained and whether the damage done to their home was reasonable." Nevertheless, the court granted summary judgment to all individual officers, excluding Agent Pike, because it believed that the Listons had failed to present evidence sufficient to establish that any of the moving defendants actually engaged in the alleged conduct: "No reasonable trier of fact could link these moving defendants to the excessive search and detention merely because they were present. Plaintiffs have failed to show more as to these moving defendants." Accordingly, the court awarded summary judgment to all defendants except Pike on the Listons' remaining claims.
 
 
 48
 In its September order granting qualified immunity to Agent Pike, the court revised its conclusions regarding the reasonableness of the length of the detention, this time reaching the opposite result. It held that a "reasonable officer could have reasonably believed that the length of the detention was lawful." In reaching that decision, the district court relied on cases it seems to have read as suggesting a bright line rule that detentions which do not exceed two hours are constitutionally permissible. Because the detention alleged by the Listons was not as long as the detentions upheld in the cited cases, the court concluded that officers could have believed their actions reasonable. It therefore granted qualified immunity to Agent Pike. Finally, with respect to the destruction of property during the search, the court held that the Listons had not produced evidence that Pike himself had destroyed property. In addition, without much elaboration, the court, relying on our decision in Redman v. County of San Diego, 942 F.2d 1435, 1447 (9th Cir.1991), held that Pike was not liable as a supervisor because he could "reasonably conclude that his conduct would not lead others to act unconstitutionally."
 
 
 49
 In reviewing these orders, we will first examine the court's decisions regarding whether the Listons suffered any constitutional deprivations, saving until last the question of the responsibility of individual officers.
 
 1. Excessive force
 
 50
 In Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, an investigatory stop, or other 'seizure' of his person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Id. at 388, 109 S.Ct. at 1867-68. In so holding, the Court set forth a non-exhaustive list of factors to be considered in evaluating whether the force used to effect a particular seizure is reasonable: we must pay careful attention to (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape. Id. (citing Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 1699-1700, 85 L.Ed.2d 1 (1985)). In Alexander v. City and County of San Francisco, 29 F.3d 1355 (9th Cir.1994), we explained the essence of the Graham objective reasonableness analysis: "[t]he force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the Graham factors." Id. at 1367. Of course, we are required to remember always that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[10] Graham, 490 U.S. at 396, 109 S.Ct. at 1872.
 
 
 51
 For the purposes of summary judgment, even in a qualified immunity case, we must assume the nonmoving party's version of the facts to be correct. Alexander, 64 F.3d at 1322. The question, then, is whether, accepting the facts alleged by the Listons as true, defendants are entitled to summary judgment as a matter of law. We hold that they are not. Recognizing, as we must, that the moments immediately following the officers' forcible entry were difficult and tense, we, nevertheless, are unable to conclude as a matter of law that the force used upon the Listons from the time of the initial entry into their house until the time of the officers' departure was reasonable, or that reasonable officers could have concluded that their acts during this entire period comported with the Fourth Amendment. It is for the finder of fact to determine the reasonableness of the force used in this case, and that can be done only upon a fully developed record. It would be inappropriate for us to attempt to do so now given the highly disputed facts contained in the affidavits of the parties. Accordingly, we reverse the district court's order granting summary judgment in favor of the defendants on the Listons' excessive force claim.
 
 2. Unreasonable detention
 
 52
 As outlined above, the district court, after initially concluding that the evidence raised "triable issues" regarding the reasonableness of the length of the Listons' detention, appears to have come to a different conclusion in its order granting summary judgment to Agent Pike. Citing two cases, Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) and Daniel v. Taylor, 808 F.2d 1401, 1405 (11th Cir.1986), the district court held that because the searches in those cases had been upheld as "constitutionally permissible" and because the search at issue in this case was no longer in duration, a "reasonable officer could have reasonably believed that the length of the detention was lawful." Apparently, the court read those cases as creating a safe harbor for qualified immunity purposes, defined solely by the length of the detention: any search less than two hours entitles the detaining officer to qualified immunity, independent of the facts or circumstances attending the detention. Because we conclude that such a view would be erroneous, and because we hold that the evidence does indeed raise "triable issues" regarding the reasonableness of the detention, particularly as to whether it continued after the officers knew or a reasonable officer would have known that a serious mistake had been made, we reverse the decision of the district court.
 
 
 53
 Our analysis of the lawfulness of the detention at issue here commences with the Supreme Court's decision in Michigan v. Summers and our cases applying that decision. In Summers, the Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705, 101 S.Ct. at 2595. It reached that conclusion relying on a line of cases upholding limited seizures of persons on less than probable cause. See, e.g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In Summers, the Court suggested the existence of some limitations on its holding: "[s]pecial circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case...." 452 U.S. at 705 n. 21, 101 S.Ct. at 2595 n. 21.
 
 
 54
 Our decision in Franklin v. Foxworth, 31 F.3d 873 (9th Cir.1994) provided an example of one type of exception contemplated by Summers. In that case, we concluded that the defendant law enforcement officers behaved unreasonably in "removing a gravely ill and semi-naked man from his sickbed without providing any clothing or covering, and then by forcing him to remain sitting handcuffed in his living room for two hours rather than returning him to his bed within a reasonable time after the search of his room was completed." Id. at 876-77. In reaching that conclusion, we held:
 
 
 55
 A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involved an undue invasion of privacy. Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from serious illness or disability raise additional concerns. Of course, the presence of any of these factors in an individual case does not establish that the detention is unreasonable per se. Rather, these factors, along with the Graham elements and any other circumstances relevant to an individual case, must be assessed in their totality.
 
 
 56
 Id. at 876.
 
 
 57
 Determining the reasonableness of the Listons' detention involves the consideration of factors not present in Summers or Franklin. The parties offer sharply conflicting accounts of the amount of time the officers detained the Listons while the search was conducted--a dispute that for purposes of summary judgment we must resolve in the Listons' favor. Here, however, the reasonableness of the detentions does not turn on the total amount of time involved but on when a reasonable officer would have known that a serious error had occurred and that the search should be terminated.
 
 
 58
 The warrant authorized a search of 8293 Saddlecreek Drive not because of anything inherent in the house itself, but because James Hill resided there and therefore probable cause existed to believe that contraband and evidence would be found on the premises. However, at some point during the search, the officers became aware they had seized Liston rather than Hill and that Hill no longer owned or occupied the house. At the moment that the degree of certainty reached such a level that a reasonable officer would have realized these facts, continued detention of the Listons became unlawful and a reasonable officer could not reasonably have believed that further detention was proper.
 
 
 59
 Indeed, defendants implicitly acknowledge this conclusion in their version of the events that transpired that day. In his affidavit, Pike asserts that "[a]s soon as I determined that [Liston] was in fact who he said he was I removed the handcuffs from him...." Moreover, they argue on appeal that the detention lasted only as long as necessary to make reasonably certain that Liston was in fact not James Rocky Hill and that Hill no longer resided at the house.
 
 
 60
 The Listons tell a different story, and the resultant dispute of fact makes summary judgment on qualified immunity grounds inappropriate. Jim Liston asserts in his affidavit that he attempted to inform the officers of their mistake almost as soon as they entered the house, but was told to "shut up," until the officers asked him for identification some fifteen minutes after dragging him handcuffed into his dining room. Venice Liston's affidavit complements her husband's and offers additional factual details. She asserts that she started yelling words to the effect of "you're making a mistake" and "you have the wrong house" moments after the officers entered. She contends in addition that within fifteen to twenty minutes of their entry the officers had photo identification of the occupants and were looking through family photo albums. She further asserts that it was clear to her that "shortly after they entered," the officers were aware that they were in the wrong house:
 
 
 61
 They were laughing and joking. It appeared to me that they were embarrassed, so that they tried to make a joke about it. I also heard them joking about the fact that we were first time home buyers. Again, this is shortly after they entered the house.
 
 
 62
 In short, under the Listons' versions of the facts, the officers continued to detain them long after a reasonable officer would have known that the wrong people were in custody and that the house was no longer owned or occupied by Hill--and, thus, long after there was any reasonable cause for continuing to invade the Listons' privacy. Certainly, the Listons have presented evidence that, if believed, is sufficient to support the conclusion that an unreasonable detention occurred. Although the officers argue correctly that they were entitled to exercise the caution of reasonable officers confronting what appeared initially to be a dangerous situation, the Listons have more than demonstrated that under the facts as they describe them, a reasonable jury could properly conclude that the detention persisted well beyond the time when a reasonable officer would have known those actions were unlawful. Accordingly, we reject that portion of the district court's decision as well.
 
 3. Destruction of Property
 
 63
 The Listons claim that the officers ransacked their home, dumping out garbage and removing items from drawers and closets, without cleaning up after themselves. They also contend that officers destroyed a backyard fence and dug up the backyard. As an initial matter, it is not clear that these actions rise to the level of a constitutional violation, as officers executing a search warrant occasionally "must damage property in order to perform their duty." Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979). Although this court has not addressed the matter, other circuits have held that only unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment. See Tarpley v. Greene, 684 F.2d 1, 9 (D.C.Cir.1982).
 
 
 64
 The difficulty in this case is that it is not clear from the record when the alleged property damage occurred. Until the officers learned that they were in the wrong house, the officers could have reasonably believed, under these precedents, that the way they conducted the search was lawful. As a result, they would be entitled to qualified immunity. But once they knew the house belonged to the Listons, their search was no longer justified. Any further damage to the Listons' property was necessarily unlawful and not protected by qualified immunity. Because of our conclusion that there is a dispute as to when the officers knew they had the wrong house, we also remand for a determination as to what damage, if any, occurred beyond that time.
 
 4. Responsibility of individual defendants
 
 65
 In support of their motions for summary judgment, defendants submitted declarations from each of the moving officers. We briefly summarize them below.
 
 
 66
 David Pike, a formally-deputized Federal Task Force Officer, stated in his declaration that it was he who gave the order to break down the Listons' door with the battering ram. When the entering officers were met near the door by a white male resembling the description of James Hill, Pike ordered the suspect, later discovered to be Liston, to get down on the floor. In his declaration, he asserted that other officers handcuffed Liston. Pike contended that he helped Liston to his feet, brought him into the kitchen and conducted an interview while the search progressed. When, according to his declaration, he determined that the male suspect was James Liston and not James Hill, Pike removed the handcuffs. Except for bringing Liston into the kitchen/dining room area, Pike claimed that he had no physical contact with the occupants of the house. In addition, Pike contended that he did not destroy or damage property while in the Listons' home and did not recall other officers doing so.
 
 
 67
 Paul Amicone, an officer with the Rialto Police Department, stated that he did not "recall handcuffing anyone or having physical contact with anyone." He admitted, however, that he did "stand by and watch a man handcuffed on the floor until another officer announced that the house was clear of additional suspects."[11]
 
 
 68
 Bart Belknap, a deputy with the San Bernardino's Sheriff's Department, asserted that his assignment was to provide additional perimeter security and that he entered the house and took up a position near the front door with his partner "to make sure no one came out." When "shortly afterwards, the person in charge said they were the wrong people," Belknap claimed to have "stepped outside," and spent the rest of the time on the front porch. He denied having "contact" with anyone inside the home.
 
 
 69
 Gail Marianes, a deputy with the San Bernardino County Sheriff's Department, was the team leader, responsible for handing out assignments to the people involved in executing the warrant. In his declaration, Marianes asserted that he did not "effect entry"[12] and had no contact with the plaintiffs "other than seeing them."
 
 
 70
 Tom Mitchell, a peace officer employed by the Ontario Police Department, was assigned to provide additional officer safety support. He stated in his declaration that "during the time the warrant was executed, I was in the front yard of the location. I did not participate in the entry nor did I enter the premises." He also denied having "contact" with any of the plaintiffs.
 
 
 71
 John Powell, a deputy with the San Bernardino Sheriff's Department, was reassigned, according to his declaration, at the last minute, to report to a house in Agoura, California. He contended that he was never at the Listons' home.
 
 
 72
 Robert Pruitt, a deputy with the San Bernardino Sheriff's Department, in a declaration identical to that of Bart Belknap, asserted that his assignment was to provide additional perimeter security and that he entered the house and with his partner took up a position near the front door "to make sure no one came out." When "shortly afterwards, the person in charge said they were the wrong people," Pruitt claimed to have "stepped outside," and spent the rest of the time on the front porch. He denied having "contact" with anyone inside the home.
 
 
 73
 Darryl Reed, a peace officer with the Ontario Police Department, was assigned to provide additional officer-safety support. He stated in his declaration, which is identical to Tom Mitchell's, that "during the time the warrant was executed, I was in the front yard of the location. I did not participate in the entry nor did I enter the premises." He also denied having "contact" with any of the plaintiffs.
 
 
 74
 Raymond Rucker, a lieutenant with the San Bernardino Sheriff's Department, contended that he was at the command post and "never any where [sic] near plaintiffs' home." He stated that he did not participate in the investigation or obtain the search warrant. In his declaration, he asserted that he "did give a part of the briefing prior to execution, but my portion of the briefing consisted of explaining the overall goals and objectives of that date and did not deal with specifics of plaintiff's location or with any of the targeted suspects."
 
 
 75
 Danny Scaturro, senior deputy with the San Bernardino Sheriff's Department, was the lead investigator who compiled the information necessary to obtain the warrant. On the day the search warrant was executed, according to his declaration, Scaturro was at the command post and had no contact with the Liston family.
 
 
 76
 On the basis of these declarations, and in light of the fact that the Listons failed to provide any additional evidence regarding the conduct of individual officers at the scene, the district court granted summary judgment to each of the moving defendants. Plaintiffs nevertheless persuasively argue that that decision was in error in large part.
 
 
 77
 The Listons apparently did not know, at least as of the time of summary judgment, which officers did what acts during the execution of the warrant: the descriptions of the events provided by the Listons in their affidavits tell only of the acts of unspecified "officers." Except insofar as the declarations submitted by the defendants themselves provide information regarding individual involvement in wrongdoing, the Listons offer no direct evidence to establish the liability of any officer.
 
 
 78
 Nevertheless, we conclude that summary judgment is inappropriate in the case of a number of the defendants. All of the officers who admit to having been inside the Saddlecreek premises during the execution of the warrant were participants in the detention of the Listons, not merely those officers who used force to handcuff Jim Liston. See United States v. Kerr, 817 F.2d 1384, 1386 (9th Cir.1987) (holding that seizure occurs where the officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen"). Because we have concluded that there is sufficient evidence to raise a genuine issue of fact regarding the reasonableness of the Listons' detention, those officers who by their presence in the home assisted in restraining them--defendants Pike, Amicone, Belknap, Marianes, and Pruitt--are not entitled to summary judgment. We also note in support of our conclusion that we have in some circumstances denied summary judgment even though plaintiffs could not state with certainty which officers had violated their rights. See Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir.1986) (holding in police brutality case that a jury could reasonably conclude that three officer defendants "were participants in punching or kicking" plaintiff, even though defendants denied assaulting plaintiff and plaintiff could not state that specific defendants punched or kicked him). In light of the particular facts in this case, we conclude that the district court's order granting summary judgment for Pike, Amicone, Belknap, Marianes, and Pruitt must be reversed.
 
 
 79
 We affirm, however, with respect to Officers Mitchell and Reed, who, according to their uncontroverted declarations, remained outside the house in the front yard at all times, ignorant of the facts learned by the officers inside the house. Rutherford does not justify denying immunity to these two officers, and nothing in the record supports any theory under which they could be held responsible for the use of excessive force against the Listons or the unreasonable detention that the Listons allege occurred. We also affirm with respect to two officers, Powell and Rucker, who offered uncontroverted evidence that they were not present at the Saddlecreek Drive residence at the time of the events in question. Deputy Scaturro, who also offered uncontroverted evidence that he was not present, similarly cannot be held responsible as a participant in the execution of the warrant. He is, however, liable for his conduct in obtaining the warrant, if the jury finds his actions reckless or intentional, as we discussed above.[13]
 
 III. CONCLUSION
 
 80
 For the reasons stated above, the orders of the district court granting summary judgment to the defendants are reversed in part and affirmed in part, and the case is remanded to the court for further proceedings in light of this opinion.[14]
 
 
 81
 AFFIRMED IN PART; REVERSED IN PART and REMANDED.
 
 
 82
 REINHARDT, Circuit Judge, dissenting from Section B.3:
 
 
 83
 I think that Section B.3. is both unnecessary and undesirable. It makes little sense to segment, and attempt to analyze with such particularity, each aspect of the search, when the search in general will in any event be carefully examined in its entirety in subsequent proceedings in the district court. I also do not believe that we are in a position at this point to make the factual determination that is necessary to support a conclusion that the officers are entitled to qualified immunity with respect to any "ransacking" that occurred prior to the time they observed that they were in the wrong house; this is particularly true because the district court made no such factual determination itself, but relied instead only on its inability to determine which of the officers was responsible for the "ransacking." I would, therefore, let the fact-finder determine the officers' liability with respect to the entire search.
 
 
 
 [1]
 Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). It is undisputed that, at all times relevant to this case, defendant-appellee David Pike acted under color of federal authority
 
 
 [2]
 Although he offered no direct evidence establishing probable cause to believe that contraband or evidence would be found at Hill's home, Scaturro supported his request with the assertion that:
 [b]ased on my experience and training, I believe that persons involved in manufacturing and distributing methamphetamine and precursor chemicals often use their residences as well as other premises to manufacture and distribute methamphetamine, to store the chemicals used in the manufacture of methamphetamine and to store paperwork, such as ledgers, reflecting sales of chemicals and methamphetamine, and income generated from the same.
 
 
 [3]
 The record provides no basis for determining with precision the date on which Scaturro made this trip to the Saddlecreek address. Instead, the record supports, at best, a range of possible dates. In his declaration, Scaturro stated that he believed that he drove to the Listons' residence "on the day before [he] prepared the [search warrant] affidavit ... but in no event was it more than a few days before preparing the affidavit." However, there is no indication in his declaration regarding the date on which he prepared the affidavit. In addition, the affidavit itself is unsigned and undated
 Obviously, March 26, 1991, the date the magistrate signed the warrant, represents the theoretical last date on which Scaturro could have prepared the affidavit. A more probable last possible date, however, is March 25. The warrant signed by the magistrate was prepared with the date March 25, 1991, typed into the appropriate space; however, someone, most likely Magistrate Judge Eick, wrote the number "6" over the "5," suggesting that, although the warrant itself was not signed until March 26, the warrant request (or a draft warrant) was prepared no later than March 25. Accordingly, although nothing in the record describes when the affidavit was prepared relative to when the warrant request (or draft warrant) was prepared, the latest date on which Scaturro could have prepared the affidavit seems to be March 25, with Scaturro's trip to the Saddlecreek address occurring no later than the day before. Thus, the last date on which Scaturro may have surveyed the premises was March 24.
 The events detailed in the affidavit reveal the other end of the range of dates within which the visit to the house may have been made. At one point toward the end of his sixty-one page affidavit, Scaturro referred to a telephone call that occurred on March 11, 1991. Accordingly, the earliest possible date on which Scaturro could have prepared the affidavit is March 11, 1991, and, as the affidavit relates, the earliest date on which his trip to the Saddlecreek Drive residence occurred was "a few days" before then. Thus, the entire range of possible dates, according to Scaturro's affidavit, is approximately March 8 through March 24.
 
 
 [4]
 We assume, arguendo, that all officers present at the search scene were privy to the information regarding Hill that was presented to Agent Pike at the briefing session
 
 
 [5]
 On appeal, the Listons do not contend that this conduct was unreasonable
 
 
 [6]
 Neither the complaint nor Liston's declaration specifies the nature or extent of his physical injuries other than to say that they were "great."
 
 
 [7]
 Hereinafter, for the sake of convenience, we will refer to the "For Sale" and "Sold" signs collectively as the "For Sale/Sold signs."
 
 
 [8]
 After thus concluding that the warrant was valid, the district court went further and held that "[e]ven were the warrant found to be invalid, Scaturro is entitled to qualified immunity from liability for obtaining the warrant, since the warrant application was not so lacking in indicia of probable cause as to render official belief in its existence unreasonable." That additional step in the district court's qualified immunity analysis was unnecessary and, more to the point, incorrect in light of our holding in Branch that, where probable cause is otherwise lacking, an officer who obtains a warrant by recklessly or intentionally including false statements (or omitting material facts) "cannot be said to have acted in a reasonable manner and the shield of qualified immunity is lost." 937 F.2d at 1387 (internal quotations omitted)
 
 
 [9]
 As noted above, see supra note 3, nothing in the affidavit permits a determination of when Scaturro drove to the Saddlecreek address and observed the For Sale/Sold signs; a magistrate, at best, would be able to infer a range of possible dates--from "a few days" before March 11 to March 24. Certainly, if the earliest possible date is assumed, the affidavit, stating that the For Sale/Sold signs had been observed at 8293 Saddlecreek Drive over two weeks before the warrant request, would not "provide a magistrate with a substantial basis for concluding that probable cause existed" to search that address. Stanert, 762 F.2d at 782. For the reasons set forth in the text above, we similarly conclude that the warrant would not simply have issued without more even if the latest date is assumed
 
 
 [10]
 We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury. See, e.g., Alexander v. County of Los Angeles, 64 F.3d 1315, 1322 (9th Cir.1995); Forrester v. City of San Diego, 25 F.3d 804, 806 (9th Cir.1994); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994); Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991). However, we have also held that defendant officers "can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Scott, 39 F.3d at 915. That conclusion, of course, is subject to de novo review. Chew v. Gates, 27 F.3d 1432, 1439 (9th Cir.1994)
 We note, in addition, that a number of our recent cases have held that in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits. Alexander v. County of Los Angeles, 64 F.3d 1315, 1322 (9th Cir.1995); see also, e.g., Scott v. Henrich, 39 F.3d 912, 914 (9th Cir.1994); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir.1994); Hopkins v. Andaya, 958 F.2d 881, 885 n. 3 (9th Cir.1992); Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.1991). Those cases may appear somewhat difficult to reconcile with language in our en banc decision in Hammer v. Gross, 932 F.2d 842 (9th Cir.1991) (rejecting plaintiff's contention that an officer who has used unreasonable force cannot, by definition, have acted reasonably, noting that "[w]hether a search is 'unreasonable' within the meaning of the Fourth Amendment is an entirely different question from whether an officer reasonably could have believed his actions lawful under the Fourth Amendment."). Because the conclusions we reach here are the same whether we follow Gross or our more recent cases, we need not decide whether any conflict actually exists.
 
 
 [11]
 Amicone's declaration, however, may be contradicted by deposition testimony given by Officer Pike, who stated that he "believe[d]" it was Officer Amicone who handcuffed Liston
 
 
 [12]
 The meaning of his statement is ambiguous: it is unclear whether he meant that he did not enter the house at all, or simply that he did not "effect" entry by using the battering ram
 
 
 [13]
 The parties do not discuss on appeal the extent to which Scaturro might be liable if the jury finds that his conduct in obtaining the warrant was reckless or intentional. Neither side mentioned either in their briefs or at oral argument the question whether Scaturro's obtaining of the warrant could result in liability for any unlawful acts of the officers who executed it. The issue is governed by traditional tort law principles. See Van Ort. v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir.1996) (stating that traditional tort law defines intervening causes that break the chain of proximate causation). The district court did not consider the question because it held that Scaturro did not act improperly in obtaining the warrant. Therefore, we do not address the extent of liability issue here
 
 
 [14]
 On cross-appeal, defendants, other than Pike, challenge the district court's denial of their motion for attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and Rule 11 of the Federal Rules of Civil Procedure. We affirm. See Christiansburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)