**Harry David WILLIAMS, et al., Plaintiffs,**

v.

**COUNTY OF SANTA BARBARA, et al., Defendants.**

**No. CV00–11122 AHM (JWJx).**

United States District Court, C.D. California.

July 14, 2003.

Donald G. Norris, Douglas F. Galanter, Oppenheimer, Wolff & Donnelly, Los Angeles, CA, Donald G. Norris, Douglas F. Galanter, Weissmann, Wolff, Berman, Coleman, Grodin & Evall, Beverly Hills, CA, Vito Costanzo, Holland & Knight, Los Angeles, CA, Murray J. Robertson, Borchard & Baur, Mission Viejo, CA, Kimberly R. Colombo, Buchalter, Nemer, Fields & Younger, Newport Beach, CA, for Plaintiffs.

Jake Stoddard, Santa Barbara County Counsel, Santa Barbara, CA, for Defendants.

Michael D. Allen, David D. Lawrence, Franscell, Strickland, Roberts & Lawrence, Glendale, CA, for Araceli Andalon.

Barbara A. Noble, CAAG—Office of Attorney General of California, Los Angeles, CA, for Brenton Chinn.

**ORDER RE MOTION OF MEYER ET AL. FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION AGAINST DALE AND LIA SCHADE.**

MATZ, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................... 999

II. FACTS ...................................................... 1000
 A. Affidavit's Allegations About Dale Schade ............................... 1001
 B. Affidavit's Allegations About Lia Schade ............................... 1002
 C. Detention of Dale Schade ........................................ 1002
 D. Searches of Lia Schade ......................................... 1003

III. SUMMARY JUDGMENT STANDARD ................................. 1003

IV. ANALYSIS .................................................. 1004
 A. The Warrants Were Not Supported By Probable Cause ................... 1005
 1. On the Face of the Affidavit, There Was No Probable Cause For The Issuance Of The Warrant As To Dale Schade ...................... 1005
 2. On The Face of the Affidavit, There Was No Probable Cause For The Issuance Of The Warrant As to Lia Schade ........................ 1006
 3. The Warrants Were Overbroad....................................... 1007
 4. Means And Those Officers Who Executed The Warrants After Reading The Affidavit Are Not Entitled To Qualified Immunity.... 1007

B. Dale Schade's *Franks v. Delaware* Claim.................................1009
C. Defendants Birchim and Meyer are Entitled to Qualified Immunity on
 Dale Schade's Unlawful Detention Claims ............................1013
 1. Was Schade Detained? .........................................1014
 2. Assuming Schade Was Detained, Was His Detention Nevertheless
 Lawful? .......................................................1014
D. Defendants Burridge and Standley are Not Entitled to Summary
 Judgment Regarding their Searches of Lia Schade's Office, Car, Purse
 and Day planner .....................................................1016
E. The Schades' Conspiracy Claims .......................................1018
 1. Conspiracy to Obtain a Warrant Unsupported By Probable Cause .......1018
 2. Conspiracy to Obtain a Warrant By Including Misleading Information
 in the Affidavit ................................................1019

V. CONCLUSION ..............................................................1020

## I.

### INTRODUCTION

Harry David Williams, Janelle Hopps, Robert Dale Schade and Lia Marie Schade[1] brought this action under 42 U.S.C. § 1983 for violation of their Fourth Amendment rights. Their suit arises from, but is not limited to, a series of search warrants that were executed beginning on January 20, 2000 for at least 16 locations. 12/20/02 Means *et al.* MSJ (Means Decl.) ¶ 7; Fourth Amended Complaint ("FAC") ¶ 29. The warrants were the culmination of a wide-ranging investigation that began some 46 months previously, in March 1996. The warrants were based on an affidavit Detective Means of the Santa Barbara Sheriff's Department ("SBSD") had prepared and were approved by Judge William McLafferty of the Santa Barbara Superior Court. The Defendants are Santa Barbara County ("SBC"); the SBSD; James Thomas (the Sheriff of SBC at the time of the acts alleged); James Auchincloss (an SBC Deputy District Attorney); Detective Means and various officers and other employees of the SBSD. The Fourth Amended Complaint also names as defendants an informant named Araceli Andalon, Andalon's

"handler" Gail Hermreck (an SBC probation officer) and Brenton Chinn of the California Department of Justice's Bureau of Narcotics.

Plaintiff Dale Schade was a SBSD Lieutenant until he retired in March 1999. Mot. Exh. D (Means Affidavit in Support of Warrant ("Affidavit")) at 7. Schade was in charge of the Santa Ynez Substation between 1994 and May 1998. Mot. Exh. X at 19:4–9 (D. Schade Depo.); Reply Exh. LLL at 163:15–164:2 (D. Schade Depo.). Thereafter, he was assigned to the SBC jail until his retirement. Mot. Exh. X at 19:10–14. Plaintiff Lia Schade married Dale Schade sometime in 1997. Opp. Exh. F at 172–73, 186.2. She is the Chief Financial Officer of the SBSD. Opp. (L. Schade Decl.) ¶ 1. She held that position at the time that Means was drafting the Affidavit. *Id.;* Aff't at 7.

Plaintiffs Dale and Lia Schade challenge the facial validity of the specific warrant applicable to them (there was one such warrant, as well as another warrant for their credit union account), arguing that the Affidavit did not provide probable cause to believe that evidence of criminal activity would be located in their possession, at their residence, in their vehicles, or at Lia Schade's office. The Schades also

---

1. Plaintiffs also include numerous business entities, most of which are owned or controlled by Plaintiffs, and which are organized and existing under the laws of foreign countries. Fourth Amended Complaint ("FAC") ¶ 5.

allege a claim based on *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), Dale Schade alleges an unlawful detention claim and Lia Schade alleges an unlawful search claim.

Fourteen Defendants—Meyer, Birchim, Means, Palera, Olmstead, Gracey, Dollar, Cintron, Swopes, Standley, Burridge, Hermreck, Auchincloss and Julie McCammon ("SBC Defendants")—have moved for Summary Judgment against Plaintiffs Dale and Lia Schade.[2] All SBC Defendants except Hermreck and Auchincloss are SBSD employees.

On March 21, 2003, the Court issued a 44 page ruling on a summary judgment motion filed by Defendant Means and a few others against the claims of Plaintiff Harry David Williams. In essence, the Court ruled that Means and certain other defendants employed by the Santa Barbara Sheriff's Department, as well as Defendants Hermreck and Auchincloss, were not entitled to qualified immunity regarding most of the items seized from Williams's house, which Williams had alleged were obtained in violation of his Fourth and Fourteenth Amendment rights. The Court found, however, that Means *was* entitled to qualified immunity on Williams's *Franks v. Delaware* claim.

In this Court's March 21, 2003 ruling, the Court also adopted a ruling previously made by Judge Harry L. Hupp in this case, to the effect that the Affidavit on its face showed probable cause that Harry David Williams had engaged in criminal money laundering, justifying the issuance of a search warrant as to him.[3] Judge Hupp's ruling was explicitly confined to the claims asserted by Williams. Indeed, at a Scheduling Conference held before this Court on July 31, 2002, this Court explicitly noted that "Judge Hupp's Order does not extend to the Schade plaintiffs, and ... the Schades are still entitled to establish the absence of probable cause." For the reasons set forth below, the Schades have done so, and for the most part the Moving Parties' motion is therefore DENIED, with the exception that Defendants Meyer and Birchim's motion on Dale Schade's wrongful detention claim is GRANTED and certain individual defendants are entitled to Summary Adjudication on the Schades' conspiracy claims.

## II.

## FACTS

Many of the facts relevant to this motion were set out in the Court's March 21, 2003 Order. The Court will not repeat all those facts here, but incorporates them by reference. Excerpts of the Affidavit relevant to the Court's analysis of the Schade warrant are included in Appendix A to this Order.

Defendant Means submitted the same Affidavit to support separate search warrants he sought for a total of 16 locations, 12/20/02 Means *et al.* MSJ (Means Decl.) ¶ 7. The warrants were linked to a total of 7 suspects, including Williams and the Schades. *Id.* ¶¶ 3, 9. The last section in each Affidavit described the particular location and/or person to be searched, except that only one Affidavit was submitted for the Schades and the properties associated with them.

---

**2.** Defendants Stanley Mathiasen and Daniel McCammon also brought this motion. However, the parties stipulated to dismiss Mr. Mathiasen and Mr. McCammon on February 18, 2003. 2/18/03 Index of Plaintiffs' Claims at 4. Additionally, Defendants Burridge and Standley are sued only by Plaintiff Lia Schade. FAC ¶ 8.

**3.** Although Judge Hupp found that the showing as to Williams was sufficient, much of the Affidavit was based on circumstantial evidence provided by Andalon, a housekeeper for Williams who the SBSD previously had deemed to be a reliable informant. As it turned out, Williams himself never was indicted or prosecuted. Neither were the Schades.

Means obtained a warrant authorizing searches of the Schades' home in Lompoc, California, their persons and their four vehicles. The property that he sought authorization to search and seize included "all documents relating to [the Schades'] personal/business financial activities." Specifically included in that category were virtually every conceivable kind of document ranging from signature cards, minutes, statements, checks, deposit forms, 1099 forms, loan applications, correspondence, agreements, credit reports, mortgages, certificates of deposit, IRA documents, wire transfers, safe deposit boxes and the like. In addition, Means sought (and obtained) permission to search and seize a vast array of "entity formation" (*i.e.* business) records; computer-tapes and discs; employment records; personal correspondence; CD–ROMs; "video cameras/camcorders/VCRs and other image capturing/reproducing devices;" personal telephone books; address books; telephone bills; cancelled mail envelopes and keys; and "any/all U.S. currency." These are just some of the categories of property described in the seven page, single-spaced, warrant.

## A. Affidavit's Allegations About Dale Schade.

According to Means, Dale Schade "[had] developed a business and personal relationship" with Williams. Aff't at 14. He had "open access" to Williams's residence and had visited that residence even when Williams was away. *Id.* Based on Andalon's purported observations, Means represented that during Schade's tenure as Commander of the Santa Ynez Substation, "Dale Schade would come to the Williams residence or Williams would contact Dale Schade ... on a daily basis." *Id.* Means also represented that a Sheriff's Deputy named Julie McCammon had reported that Williams would "periodically" visit Dale

Schade at the Santa Ynez Substation. *Id.* at 21.

According to the Affidavit, during his employment by SBSD, Dale Schade picked up or delivered packages for Williams "once or twice a month, although it was not constant but occasional." *Id.* at 14. Andalon stated that "on several occasions" Schade assisted Williams in loading "suspicious" packages at Williams's residence. *Id.* at 15. She "described the suspicious packages as duffel bags ... as well as large size manila envelopes." On one occasion, Andalon observed Dale Schade loading a heavy ice chest onto his vehicle at Williams's residence. According to Andalon, Dale Schade would not allow her to touch the chest. *Id.* On another occasion, Williams gave Blair Paul a duffel bag and then contacted Schade. The Affidavit states that Schade "was overheard"—by Andalon, presumably, although that is not clear—telling Williams "everything was ready and it was safe for Paul to leave." *Id.* at 16. "At the end of March or the beginning of April 1998," Dale Schade collected a "special package" from Williams's residence and took it to Arizona where he allegedly met Williams. *Id.* at 15. Dale Schade traveled to Arizona via Williams's private plane. *Id.* Means later discovered a guest card and bill from The Phoenician resort in Phoenix in the Schades' trash in which the guest name was listed as "M/M Clyde Cessna" and the room was billed to a credit card issued to "H. David Williams/Williams Aviation Company." The bill reported an arrival date of March 29, 1998 and a departure date of April 1, 1998. *Id.*

The Affidavit also recounts an incident in July 1996 in which Williams called Daniel and Julie McCammon (SBSD officers), told them he had fled the scene of a car accident that day, and said he wanted Daniel McCammon to talk to the investigating officer to tell the officer that Williams is "a good guy." *Id.* at 19–20. Daniel McCam-

mon refused to do so. *Id.* at 20. The accident investigation later revealed that Williams had been driving in excess of 115 miles per hour and had been under the influence of alcohol. *Id.* Williams pled *nolo contendere* to "significantly reduced charges" and managed to "avoid[ ] imprisonment." *Id.* at 20–21. When Julie McCammon asked Schade about the accident, Schade stated that he had "taken care of Williams." *Id.* at 21. In the Affidavit Means stated that he believed that Schade influenced the prosecution of the accident based in part on (a) Julie McCammon's representation to him that Schade and the Deputy District Attorney responsible for prosecuting the case were "close personal friends," *id.* at 21, on (b) the Deputy District Attorney's reputation for strict prosecution of alcohol-related incidents, *id.* at 22, and on (c) the fact that one month after the accident Schade managed to pay off a $10,000 mortgage loan he had taken out some five months previously. *Id.* at 22–23.

Finally, the Affidavit noted that Williams had paid for a "recent" (no date was specified) trip to Europe for the Schades, *id.* at 7, 14, and had given them "cash gifts," *id.*, and credit cards. *Id.* at 7, 32. It noted that "Dale and Lia Schade openly bragged about Williams paying for a 'honeymoon' trip to Europe for the both of them." *Id.* at 14.

### B. Affidavit's Allegations About Lia Schade.

The Affidavit contains few references to Lia Schade. It asserts that she "has a close personal relationship with Williams and has received cash gifts and favors from Williams," Aff't at 7, that Williams had paid for a trip to Europe for both Lia and Dale, *id.* at 7, 14, and that she had received credit cards from Williams. *Id.* at 7, 32. It also asserts that she and Dale had "open access" to the Williams property and alleges vaguely that she and Dale had "developed a business and personal relationship" with Williams. *Id.* at 14. The Affidavit contains no allegations of specific interactions between Lia Schade and Williams, no allegations that she ever met with Williams or was at Williams's residence without Dale being present, no allegations of her involvement with any of the supposedly "suspicious" packages, and no allegations of apparent courier activity on her part.

### C. Detention of Dale Schade

On the morning of January 20, 2000—the same day that the search warrant for the Williams residence was executed, 3/21/03 Order at 5:27; Mot. (Meyer Decl.) ¶ 5—Defendants Birchim and Meyer executed a search warrant at Dale and Lia Schade's home. Opp. (D. Schade Decl.) ¶ 6. Meyer and Birchim found Dale Schade outside his residence near the garage. Schade indicated that he was about to take his cat to a veterinary appointment. Mot. (Meyer Decl.) ¶ 13. Schade declares that Birchim and Meyer were accompanied by "nine or ten other officers." *Id.* Schade also maintains that when Meyer and Birchim arrived, they "blocked [Schade's] car in the driveway," Opp. (Schade Decl.) ¶ 6, and would not allow him to leave for the veterinarian. Opp. (Schade Decl.) ¶ 7.[4]

---

4. Defendants assert that Schade's declaration contradicts his previous deposition testimony. According to Defendants, Schade testified as follows: "I said, well, I got an appointment with the vet. And they said, well, I think this is more important, so let's go in here and talk. They didn't tell me I couldn't leave, but they certainly didn't say, yeah, you can go if you want. They didn't say that." Opp. at 20:4–8 (citing Reply Exh. LLL at 15:7–12 (D. Schade Depo.)). Defendants' citation to the record is incorrect. After reading all of the excerpts of Schade's deposition that Defendants proffered in their moving and reply papers, the Court was unable to locate the alleged testimony.

Meyer and Birchim declare that Meyer asked Schade whether he "could wait on the veterinary appointment" and that Schade did not respond. Mot. (Meyer Decl.) ¶ 13. They also declare that Schade was told during the execution of the warrant that he was free to leave the residence. *Id.* ¶ 15; Mot. (Birchim Decl.) ¶ 13. It is undisputed that the search of the residence lasted approximately three hours, *id.* ¶ 17; Mot. (Meyer Decl.) ¶ 18, and that Schade was permitted to attend to his laundry while the search was underway. However, officers apparently followed and monitored him while he did so. Opp. (Schade Decl.) ¶ 8; Mot (Meyer Decl.) ¶ 17.

During the search, Meyer and Birchim interviewed Schade for approximately two and a half hours. That interview was recorded. Opp. (Schade Decl.) ¶ 8. Schade characterizes the interview as an "interrogation" in which the officers "confined" him to his dining room for "most of that time." *Id.* Birchim and Meyer contend that Schade consented to the interview. Mot. (Birchim Decl.) ¶ 12; Mot. (Meyer Decl.) ¶ 14. Meyer declares that when he told Schade that he wanted to talk to Schade about his relationship with Williams, Schade replied: "I will give you everything I've got." Reply (Meyer Decl.) ¶ 2. Meyer and Birchim also maintain that during the interview Schade was told that he could "walk out the door at any time," Mot. (Birchim Decl.) ¶ 11, receive phone calls and walk around the residence (provided he was escorted by SBSD personnel). *Id.* ¶ 13; Mot. (Meyer Decl.) ¶ 15. They also contend that Schade helped himself to water in the kitchen on several occasions, that he made coffee which he served to Birchim and Meyer, *id.* ¶ 17; Mot. (Birchim Decl.) ¶ 16, and that he periodically took breaks to use the restroom, answer telephones or walk around. *Id.* ¶ 19; Mot. (Meyer Decl.) ¶ 20.

### D. *Searches of Lia Schade*

On January 20, 2000, Defendants Burridge and Standley interviewed Lia Schade at her office at the SBSD, searched her office, car and purse, and made copies of her day planner. Burridge and Standley contend that although they had the search warrant with them at the time, they did not serve it on her, because she consented to the searches. Mot. (Burridge Decl.) ¶ 8; Mot. Exh. AA at 21:23–22:6 (Standley Depo.). In his deposition, Standley stated that he never told Lia Schade that a warrant had been executed at the Schade residence, nor that he and Burridge possessed a warrant to search Lia Schade's office, purse and car. *Id.* at 21:23–22:6. However, Lia Schade maintains that Burridge and Standley told her during the interview that "the SBSD had a warrant to search [her] office, purse, day planner, etc., and therefore [she] did not protest their search, as [she] believed it was futile to do so." Opp. (L. Schade Decl.) ¶ 4. Lia Schade also maintains that the officers told her that they had executed search warrants at her home. Reply Exh. GGG at 70:11–14 (L. Schade Depo.). She testified that she agreed to allow the officers to conduct their searches, because "it was insinuated that I did not have a choice," Mot. Exh. Y at 85:21–22 (L. Schade Depo.), and because a sign posted at the entrance to the SBSD campus indicated that all items brought there were subject to search. Reply Exh. GGG at 69:9–14 (L. Schade Depo.).

### III.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See id.* at 325, 106 S.Ct. 2548. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (*citing Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

## IV.

### ANALYSIS

In their motion, Defendants argue that: (1) the warrants were facially valid as applied to both Dale and Lia Schade; (2) the Schades cannot prevail against the Defendants on their *Franks v. Delaware* claim; (3) Defendants Birchim and Meyer did not unlawfully detain Dale Schade during the search of his home; (4) the searches of Lia Schade's office, car, purse and day planner did not violate the Fourth Amendment; and (5) the Schades cannot show that SBSD officials conspired to violate their Fourth Amendment rights.[5]

---

5. The SBC Defendants also challenged Lia Schade's unlawful detention claim, Dale Schade's First Amendment claim, the Schades' property damage claim, the Schades' retention of property claim and the Schades' claim regarding Andalon's activities. The Schades have since acknowledged that they are no longer asserting these claims against the SBC Defendants. *See* SGI ¶¶ 83, 91, 96, 101, 104. Accordingly, Summary Adjudication in favor of Defendants on these claims is GRANTED.

In general, the Schades' arguments as to why the Means Affidavit failed to present probable cause for the issuance of the warrant can be summarized as follows:

- The Affidavit relied too heavily (or almost entirely) on Andalon and she was patently unreliable.
- The Affidavit lacked evidence of probable criminal activity on the part of the Schades.
 - (a) The Schades' activity was non-criminal on its face.
 - (b) The Schades' activity was remote in time.
- Even if there was probable cause to search or seize some items, the scope of the warrant was impermissibly broad.

Next, the Schades argue that the Affidavit purposefully and misleadingly omitted information known to Means which, had it been disclosed, would have demonstrated to the Superior Court judge that there was no probable cause.

The Court rejects the Schades' first argument, because nothing on the face of the Affidavit suggested that Andalon was not reliable and because Andalon had proved a reliable informant in previous investigations. *See* 3/21/03 Order at 4:17–19.

## A. *The Warrants Were Not Supported By Probable Cause*

### 1. On the Face of the Affidavit, There Was No Probable Cause For The Issuance Of The Warrant As To Dale Schade

Applying the "totality of circumstances analysis" reaffirmed in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the test is whether "there is a fair probability that contraband or evidence of a crime [would] be found in [the] particular place[s]" to which the warrant applied. *Id.* In reviewing the affidavit, the Court's duty "is simply to ensure

that the magistrate [here, Judge McLafferty] had a 'substantial basis for concluding' that probable cause existed." *Id.* at 238–239, 103 S.Ct. 2317. As stated in *Greenstreet v. County of San Bernardino,* 41 F.3d 1306 (9th Cir.1994), "[t]he facts presented must be sufficient to justify a conclusion that the property which is the object of the search is probably on the premises to be searched at the time the warrant is issued." *Id.* at 1309 (citation deleted). Thus, probable cause could be established even if the Schades had not themselves engaged in criminal activity. *See Zurcher v. The Stanford Daily,* 436 U.S. 547, 559, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) ("[I]t is untenable to conclude that property may not be searched unless its occupant is reasonably suspected of crime and is subject to arrest; [the issue is whether] it is satisfactorily demonstrated to the magistrate that fruits, instrumentalities, or evidence of crime is located on the premises.")

 The facts about Dale Schade set forth in the Affidavit fail to establish probable cause, even if—indeed, especially if—the magistrate were to make a "practical, common-sense decision." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. Despite almost four years of investigation, there was no evidence set forth in the Affidavit of any of the following:

- That Williams had ever visited the Schades' residence. (Oddly, there is evidence that Andalon did; she apparently cleaned it, twice. Opp. Exh. F. at 174 (Birchim Interview with Andalon). Yet Andalon reported nothing even remotely suspicious about the Schades' residence.)
- That any of Williams's financial records were kept by the Schades or at the locations to be searched.
- That contraband had been seen, much less found, in any of the Schades' vehicles.

- That contraband had been seen, much less found, in the Schades' residence or at their work stations or offices.
- That contraband had been seen, much less found, on the Schades' persons.
- That the Schades (or either of them) had made oral or written admissions of engaging either in criminal money laundering or narcotics dealing.
- That the Schades, or either of them, had destroyed or secreted any evidence of contraband, narcotics, or money laundering.
- That the Schades, or either of them, had achieved a great, sudden or inexplicable increase in their net worth or their tangible wealth. (There was no "source and application" analysis of even the incomplete kind performed as to Williams.)
- That Dale Schade had actually spoken to Deputy District Attorney Bullard about Williams's 1996 speeding violation and accident.[6]
- That Dale Schade paid off the $10,000 mortgage loan from his credit union with proceeds or monies derived from (a) Williams or (b) money laundering or (c) narcotics activity.
- That either of the Schades ever maintained financial accounts in institutions located in Switzerland or the Caribbean.

There simply is no evidence in the Affidavit establishing that evidence of criminality probably would be found on the Schades or their property, even if the few banal and benign instances of specific conduct attributed to Dale Schade had not been so remote in time. (See Section IV.B, *infra*.) Moreover, the Affidavit actually contains information that is more consistent with the Schades' innocence than with the conclusion that there probably would be evidence of criminality in the premises and things to be searched. The Affidavit discloses that instead of being covert and surreptitious, the Schades' friendship with Williams was openly disclosed. Andalon herself had reported that Williams would contact Dale Schade "by telephone or in person, on a daily basis during Schade's tenure as the Commander of the Santa Ynez Valley Sheriff's Substation." Aff't at 14. Julie McCammon corroborated that Williams stopped by the Substation. *Id.* at 21. The friendship between Williams and the Schades was extremely well known within the SBSD. Under-Sheriff Dorsey knew about it. Opp. Exh. V at 22:14–23:10. So did Lt. Rogers. *Id.* Exh. KK at 25:19–28:16. Dale Schade obtained SBSD approval to conduct appraisal work for Williams. *Id.*, D. Schade Decl. ¶ 5. When Williams held a party for the Schades at his house, "most of the [SBSD] had been invited." *Id.* Exh. X at 48:17–21.

Any Detective or Magistrate exercising common sense should have found it peculiar that Dale Schade, a veteran and ranking officer of a law enforcement agency (SBSD) in a relatively small community, and his wife Lia Schade, a civilian-employee of the SBSD, would engage in criminal activity with someone (Williams) whose recent presence in the community was conspicuous and whose friendship with them was so well-publicized.

**2. On The Face of the Affidavit, There Was No Probable Cause For The Issuance Of The Warrant As to Lia Schade.**

No reasonable officer could have concluded that the Affidavit set forth suffi-

---

**6.** Means and Finley did not even bother to interview Bullard until after the warrants had been executed. Reply Exh. FFFF at 386.

cient information to implicate Lia Schade. In the Affidavit, she was not even mentioned as a co-conspirator (p. 50) or a Penal Code violator (p. 54.) Given the absence of evidence of Lia Schade's involvement with Williams's suspicious activities, no reasonable officer could have concluded that there was probable cause to believe that she would have "records" of her husband's allegedly illegal activities "on [her] person at any given time," *id.* at 56, nor that there was probable cause to conclude that such evidence would be located in her office, purse, vehicle or personal day planner. The most charitable reading of the Affidavit establishes, at most, that Lia was an ancillary participant in some facets of her husband's friendship with Williams. That she was Dale's spouse could not, and without more did not, suffice to establish probable cause that she was involved in either Dale's or in Williams's allegedly criminal activities.

### 3. The Warrants Were Overbroad.

■ A warrant cannot authorize a search broader in scope than the probable cause upon which that warrant is based permits. *United States v. Weber*, 923 F.2d 1338, 1346 (9th Cir.1991).

■ Here, there was no probable cause in the first place. Moreover, as is set forth in Section II above, the warrants were excessively broad—almost shockingly so. They read as if the drafter had borrowed from, and then mechanically modified, the kind of fishing expedition a first year law firm associate comes up with in drafting a request for production of documents. It reflects the approach of someone who constantly was asking himself, "Is there anything that I forgot? Can there possibly be something else I can add?" What could possibly justify seizing video

cameras, VCRs, computer manuals, and utility company receipts?[7]

### 4. Means And Those Officers Who Executed The Warrants After Reading The Affidavit Are Not Entitled To Qualified Immunity.

Qualified immunity shields public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In ruling on a summary judgment motion based on qualified immunity, the court must conduct a two-step inquiry. First, the Court must ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" when viewed in the context of the case. *Id.*

For a right to be "clearly established," "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citation deleted). "If officers of reasonable competence could disagree on the issue [whether a chosen course of action is constitutional], immunity should be recognized." *Brewster v. Board of Education of the Lynwood Unified School District*, 149 F.3d 971, 977 (9th Cir.1998) (*quoting Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d

---

7. This is not to say that the warrant was an invalid "general warrant." *Marks v. Clarke*, 102 F.3d 1012, 1030–31 (9th Cir.1997). Rather, the warrant did not provide probable cause to search and seize the myriad items listed therein.

271 (1986)). Put more simply, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

The Fourth Amendment to the Constitution was adopted in 1789 and made applicable to the States no later than in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Illinois v. Gates, supra* was decided in 1983. *Greenstreet, supra,* was decided in 1994. The constitutional principles requiring probable cause and prohibiting overbroad warrants were clearly established at the time that Means procured the warrants and other officers executed them.

■ The affidavit that Detective Means submitted to Judge William McLafferty failed to establish probable cause as to the Schades. Neither Means nor any officer who claims to have acted in reliance on the affidavit is entitled to qualified immunity. In reaching that conclusion, the Court is applying the standards articulated in *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). That case

> present[ed] the question of the degree of immunity accorded a defendant police officer in a damages action under 42 U.S.C. § 1983 when it is alleged that the officer caused the plaintiffs to be unconstitutionally arrested by presenting a judge with a complaint and a supporting affidavit which failed to establish probable cause.

*Id.* at 337, 106 S.Ct. 1092. Speaking for the seven member majority (the two remaining justices concurred in part), Justice White held that

> "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *[United States v.] Leon* . . . defines the qualified immunity accorded an officer whose request for warrant allegedly caused an

unconstitutional arrest. Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost."

*Id.* at 344–345, 106 S.Ct. 1092. Justice White went on to state that:

> The . . . question . . . is whether a reasonably well-trained officer in [Means's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest. It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

*Id.* at 345–46, 106 S.Ct. 1092. *See also Marks v. Clarke,* 102 F.3d 1012, 1028 (9th Cir.1997) (that a warrant was reviewed by a prosecutor and signed by a magistrate does not, standing alone, provide a basis for an officer to establish reasonable reliance on the warrant).

Here, the Schades were the victims of unlawful searches. No reasonably well-trained officer would have believed that the Affidavit supported probable cause as to the Schades. Thus, Means violated the Schades' clearly established constitutional rights when he evidently succumbed to the evil of attributing guilt merely by virtue of the Schades' facially innocent association with Williams. Moreover, any other officer who read and relied on the Affidavit to

search the Schades is also not entitled to qualified immunity.[8]

## B. Dale Schade's *Franks v. Delaware* Claim.[9]

█ In principle, this claim is moot because the Court has found no probable cause. Nevertheless the Court will address it in the event that the Ninth Circuit disagrees with this Court about the probable cause issue.

Dale Schade contends that Means displayed a deliberate disregard for the truth in the Affidavit and that but for Means's dishonesty, the Affidavit would not have supported a finding of probable cause.

█ The Court discussed in its previous order the qualified immunity standards for alleged misrepresentations or omissions in search warrant affidavits in Section 1983 cases. *See* 3/21/03 Order at 26–27. To survive summary judgment, a plaintiff must "1) make a 'substantial showing' of deliberate falsehood, [material omission,] or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred." *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir.1997) (quoting *Hervey v. Estes*, 65 F.3d 784, 788–89 (9th Cir.1995)). To meet his burden, Dale Schade's attack on the Affidavit

> must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of

reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Dale Schade's central argument is that the Affidavit misleadingly conceals details which, if properly revealed, would have shown that most of the allegations regarding Dale Schade were based on evidence acquired in mid–1998 or earlier—about 18 months before the warrants were served in January 2000. Schade contends that had the magistrate known about the "staleness" of the evidence, the magistrate would not have concluded that the Affidavit established probable cause to suspect that evidence of wrongdoing would be found at Dale Schade's residence, in his possession or in his vehicles in January 2000. The Court agrees with Schade that Means's presentation of the evidence in the Affidavit was intentionally misleading and that had the Affidavit been cured of its deficiencies, the warrant would not have supported a finding of probable cause.

---

**8.** As the Court discusses in Section IV.C.2., *infra,* Birchim and Meyer are entitled to qualified immunity, because they reasonably relied on the warrant, not the Affidavit, when they detained Dale Schade. As for Lia Schade's unlawful search claim, the Court noted in Section II.D. *supra,* that Defendants Burridge and Standley never served the warrant on Lia Schade; they maintain that Lia Schade consented to the searches of her office, day planner, purse and vehicle. Thus, whether Burridge and Standley are liable for

those searches turns on the validity of Lia Schade's consent, and not whether they were entitled to rely on the Affidavit or warrant. *See* Section IV.D., *infra.*

**9.** To the extent that Lia Schade is also asserting a *Franks* claim, *see* Index of Plaintiffs' Claims No. 1, all SBC Defendants are entitled to Summary Adjudication. Lia Schade has not shown that Means misrepresented or omitted from the Affidavit significant information he had learned about her.

Schade argues that references to him in the Affidavit tend to give the misleading impression that Means had recent evidence of suspicious activities linked to Schade. For example, Means declared that Andalon had reported that Schade "would come to the Williams residence or Williams would contact Dale Schade, by telephone or in person, on a daily basis during Schade's tenure as a Commander of the Santa Ynez Valley Sheriff's Substation." Means also stated that Sergeant Julie McCammon had reported that Williams would "periodically" stop by the Santa Ynez Substation to visit Dale Schade. Aff't at 21. The Affidavit did not mention that Schade had ceased working at the Santa Ynez station in May 1998—19 months before the Affidavit was submitted to Judge McLafferty. Reply Exh. LLL at 163:15–164:2 (D. Schade Depo.). The Affidavit cited Andalon as having reported that "Dale and Lia Schade had open access to the Williams property and have visited ... while Williams [was] at home and away." Id. at 14. The Affidavit omitted that Andalon had reported the Schades' "open access" in March 1998, Opp. Exh. F at 172 (Birchim interview with Andalon), and that Means had concluded that as of May 1998 "Schade's trips to [Williams's] house [were] fairly infrequent." Opp. Exh. F at 280 (Briefing Prepared by Means and Gracey on March 3, 1999); Reply Exh. LLL at 163:15–164:2 (D. Schade Depo.). Schade also argues that the Affidavit misleadingly characterized as "recent" a trip that he, Lia Schade and Williams took to Europe for which Williams paid. Id. at 7. Means knew that the trip occurred in July 1998. Opp. Exh. F at 193 (Hermreck interview with Andalon).

Means's characterization of Andalon's "suspicious packages" reports was also misleading. Means discussed two specific instances in which Andalon reported that she had seen Schade in contact with such packages. First, Means represented that Andalon had seen Dale Schade collect a "special package" from Williams's residence at some time "at the end of March or the beginning of April 1998" which he delivered to Williams in Arizona. Aff't at 15. Means later discovered a guest card and bill from The Phoenician resort in Phoenix, AZ, listing an arrival date of late March 29, 1998 and a departure date of April 1, 1998, in the Schades' trash. The guest name was "M/M Clyde Cessna" and the room was billed to Williams's credit card. Id. Since he appeared to have stayed in Phoenix under an assumed name after he collected the "special package," this presumably rendered Schade's apparent courier activities even more suspicious. However, Detective Birchim's interview notes show that Andalon had represented that Dale Schade picked up the "suspicious package" sometime in 1997. Opp. Exh. F at 173 (3/25/98 Birchim interview with Andalon) (recounting that Schade picked up the "special package" from Williams's residence "last year."). Thus, not only was the "special package" evidence up to three years old, there was no evidence that Schade had used a fictitious name in 1997 in the course of transporting the package to Arizona.

The other specific instance of apparent courier activity that Andalon reported was undated. Means declared that "[o]n one occasion" Andalon had observed Dale Schade at Williams's house loading a heavy ice chest into his vehicle and that Schade would not allow Andalon to touch the chest. Aff't at 15. Means omitted that Andalon had reported this incident on June 18, 1998 to Detective Cintron and that the incident had occurred on May 31, 1998—over 19 months before Means submitted the Affidavit to Judge McLafferty. Opp. Exh. F at 186.2 (Cintron interview with Andalon). Means also omitted that Williams had hosted an anniversary party

for the Schades on May 30, 1998 and that the ice chest (characterized as a "cooler" in Cintron's notes) had been delivered to Williams's property on the day before the party, *id.,* thus concealing a probable innocent explanation for the presence of the mysterious "ice chest."

Means also attributed to Andalon several non-specific observations regarding Schade's involvement with suspicious packages and courier activity. He represented that "Schade has delivered and escorted . . . suspicious packages for Williams many times. On several occasions Schade has met Williams at the residence and assisted him in loading suspicious packages." Aff't at 15. According to Means, "while [Schade was] employed with the Sheriff's Department," Andalon observed Schade picking up or delivering packages for Williams "once or twice a month." *Id.* at 14. The Affidavit states that Schade retired from the SBSD in March 1999, thus intimating that Schade was involved with the suspicious packages until that time. Again, the Affidavit omitted that Means had characterized Schade's trips to the house as "fairly infrequent" after May 1998. Opp. Exh. F at 280 (Briefing Prepared by Means and Gracey on March 3, 1999); Reply Exh. LLL at 163:15–164:2 (D. Schade Depo.). The Affidavit also omitted that as of July 1998, Hermreck (Andalon's "handler") was meeting with Andalon regularly and filing reports every few days regarding Andalon's observations, *see* Opp. Exh. F at 186.1–218, and that by October 1998, Hermreck was filing such reports nearly every day until the warrants were executed in January 2000. *Id.* at 220–272, 289–305, 323, 329, 335–339, 344–345, 369–373, 380–387, 390–92, 412–13,

428, 432–34, 443–56, 464–76, 483–86, 495–98, 505, 520–21, 543–49. In those reports, Hermreck recorded in detail Andalon's observations about the mundane comings-and-goings of suspects—and the movement of packages—to and from the Williams residence. None of those reports after July 28 mentions Dale Schade being involved with any packages, suspicious or otherwise. In fact, the Schades appear only three times in Andalon's near-quotidian reports between July 1998 and January 2000.[10] Means knew that Hermreck's reports of Andalon's observations during and after July 1998 did not contain any references to courier-type activity on Schade's part, but left that out of the Affidavit.

Had the Affidavit included the evidence, certainly available to Means, that anchored in time nearly all references to Dale Schade, the magistrate would have been aware that nearly all of the specific evidence about him was at least a year old. Evidence of Schade's visits to Williams's residence after May 1998 was sparse. The specific evidence relating to "suspicious packages" referred to incidents that had occurred in 1997 and May 1998. The allegation regarding Williams's traffic accident, including that Schade paid off a $10,000 loan one month after the accident, was based on events that occurred in 1996. Aff't at 19–23. The conversation in which Schade supposedly told Williams over the telephone that it was "safe for [Blair] Paul to leave" occurred in March 1998. Aff't at 16. The non-specific and conclusory view attributed to Andalon that "she believes Schade has supported Williams's suspicious activities by using Schade's Law Enforcement influence in the Santa Ynez Valley," was not enough for probable cause in

---

**10.** First, Andalon reported the July 1998 trip of Williams and the Schades to Europe. Opp. Exh. F at 193. Second, Andalon reported that on April 19, 1999, Williams had told her that while Williams was away on a trip, "Dale will be coming to check on the house and possibly spending the night." *Id.* at 369. Finally, Andalon reported that on July 30, 1999 she had overheard Williams call Dale Schade and ask him when he would be ready to travel to Arizona. *Id.* at 449.

January 2000, given that Schade ceased working at the Santa Ynez Valley substation in May 1998.[11]

■ "A search warrant is not stale where there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Bowman,* 215 F.3d 951, 964 (9th Cir. 2000). Staleness must be evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought," *United States v. Pitts,* 6 F.3d 1366, 1369 (9th Cir.1993); a mere lapse of substantial amounts of time is not determinative. *Id.* In particular, "when a police investigation relates to a continuing criminal business ... courts will permit greater lapses of time between the dates of the activities described in the affidavit and the date of the warrant request." *United States v. Fisher,* 137 F.3d 1158, 1164 (9th Cir.1998). This is especially the case where older information is coupled with recently obtained information. *E.g. United States v. Vaandering,* 50 F.3d 696, 700 (9th Cir.1995); *United States v. Foster,* 711 F.2d 871, 878 (9th Cir.1983) (evidence of drug transactions that occurred fifteen months before search warrant issued not stale where evidence also linked defendant to drug sale that happened twelve months later). The reason courts accept a more substantial lapse of time in these situations "is that criminal entrepreneurs, much like their legitimate counterparts, likely will retain the equipment and capital of their enterprise for a long period of time. Thus, evidence of a criminal business operating at a particular location in the not-so-distant past may reasonably give rise to a belief that a search of the location would yield further evidence." *Fisher,* 137 F.3d at 1164.

The Court previously held that the Affidavit established probable cause to conclude that *Williams* was running a narcotics and money laundering operation "at a particular location" his home. Thus, under *Fisher* the evidence regarding so-called "suspicious packages" being delivered and picked up from Williams's residence by Schade, even if several months or years old, could be sufficient to justify a search of *Williams's* residence for equipment, capital and records of his criminal business. However, such evidence would not necessarily support a finding of probable cause to search another location—Schade's residence—when there was never any evidence presented that Schade's home was ever a part of Williams's business. The evidence that Schade was involved with "suspicious packages" at Williams's residence over a year before the warrant was executed could not have provided probable cause to believe that evidence of Williams's criminal business would be found at

---

11. In their Reply, Defendants proffer evidence from a conversation between Williams and Julie McCammon that the SBSD surreptitiously recorded. In that conversation, which occurred on October 13, 1999, Williams merely stated that he had seen Dale Schade recently, that they had traveled together to Phoenix in August 1999 and that Schade and Williams had "talk[ed] about different business ideas that [Williams] told [Schade] he could run." Reply Exh. ZZZ at 353–55 (Investigative Report Prepared by Means); Reply (J. McCammon Decl.) ¶¶ 6–7. Although Means referred to that recorded conversation in the Affidavit, he did not recount any mention of Schade by Williams. Aff't at 22. To defeat summary judgment on a *Franks* claim, Plaintiff must make a substantial showing of deliberate or reckless disregard for the truth in the affidavit and that but for the dishonesty, the affidavit would not support a finding of probable cause. *Franks,* 438 U.S. at 171–72, 98 S.Ct. 2674. Even if this new information were sufficient for probable cause, which it is not, it is not appropriate for defendants to overcome the *Franks* claim by proffering additional evidence in their favor that they chose not to include in the affidavit in the first place.

*Schade's* home, in his vehicles or in his possession in January 2000.

For these reasons, the Court holds that Dale Schade has made a substantial showing that Means deliberately omitted information that, if included, would have resulted in a finding of no probable cause to search his residence, his vehicles or Schade himself. Accordingly, Means's Motion for Summary Adjudication of Dale Schade's *Franks v. Delaware* claim is DENIED.

■ On the facts presented here, only Defendant Means, who drafted the Affidavit, may be liable under Dale Schade's *Franks* claim. The other SBC defendants could be liable under a *Franks* claim if they were shown to have made "a deliberate or reckless misstatement" that was incorporated in the Affidavit and which, had the information not been included, would have resulted in a finding of no probable cause. *See Hart v. O'Brien,* 127 F.3d 424, 448 (5th Cir.1997), abrogated on other grounds, *Spivey v. Robertson,* 197 F.3d 772 (5th Cir.1999) ("[A] deliberate or reckless misstatement or omission by a governmental official who is not the affiant may … form the basis of a *Franks* claim."); *United States v. DeLeon,* 979 F.2d 761, 763–64 (9th Cir.1992) (same). Plaintiffs have not proffered any evidence that Defendants Birchim, Palera, Olmstead, Hermreck, Gracey, Dollar, Cintron, Swopes or Auchincloss, who performed various roles in the investigations, deliberately mis-reported what they discovered to Means. Accordingly, those SBC Defendants are entitled to Summary Adjudication on the *Franks v. Delaware* claim.

Sergeant Julie McCammon, whose accounts of her contacts with Williams and Dale Schade appear in the Affidavit, also is entitled to Summary Adjudication. In reference to Williams's 1996 traffic accident for which Williams was facing charges, she told Means that when she had asked Dale Schade if he knew about the accident, Schade responded that he had "taken care of Williams." Aff't at 21. McCammon also told Means that she believed that Schade and Edward Bullard—the Deputy District Attorney responsible for the case—"are close personal friends." *Id.* Plaintiffs have proffered a declaration by Mr. Bullard in which he declared that at the time he prosecuted Williams in 1996, he and Schade were not friends. Opp. (Bullard Decl.) ¶ 2. Plaintiffs appear to argue that Julie McCammon is therefore liable for falsely representing to Means that Bullard and Schade were friends.

However, while Bullard's declaration may raise a genuine issue about whether Schade and Bullard were actually friendly in 1996, it does not create an issue about what McCammon *knew* and whether she *intentionally* or *recklessly* misrepresented what she knew when she spoke with Means. *Liston,* 120 F.3d at 973. McCammon testified that she had seen Bullard and Schade speaking with each other at the station and that she knew that Dale Schade had attended parties held by Bullard at Bullard's home. Reply Exh. DDDD at 36:3–18 (J. McCammon Depo.). She testified that it was on the basis of those observations that she believed that Schade and Bullard were friends. *Id.* Plaintiffs have proffered no evidence tending to show that McCammon had reason to believe that Schade and Bullard actually were *not* friends and that she intentionally or recklessly told Means otherwise. Accordingly, McCammon is entitled to Summary Adjudication on Dale Schade's *Franks* claim.

**C.** *Defendants Birchim and Meyer are Entitled to Qualified Immunity on Dale Schade's Unlawful Detention Claims.*

Defendants Meyer and Birchim move for Summary Judgment on Dale Schade's claim that he was unreasonably detained

during the search of his residence.[12] They argue first that Schade was never detained; he was free to leave at any time. Alternatively, they argue that even if Schade was detained during the search, the detention was constitutional.

### 1. Was Schade Detained?

■ Construing the facts in Dale Schade's favor, the Court finds that there is a genuine issue about whether Defendants Birchim and Meyer detained him. "For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Chan–Jimenez*, 125 F.3d 1324, 1326 (9th Cir.1997) (citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Birchim and Meyer maintain that no seizure occurred, because they claim that Schade was told that he was free to leave the residence during the execution of the warrant. Mot. (Meyer Decl.) ¶ 15; Mot. (Birchim Decl.) ¶ 13. However, Schade maintains that when Meyer and Birchim arrived, they "blocked [Schade's] car in the driveway," Opp. (D. Schade Decl.) ¶ 6, and would not allow him to leave to take his cat to the veterinarian. He also declares that during the two and a half hour interview Meyer and Birchim conducted during the search of his residence, he was "confined" to his dining room "most of the time." *Id.* ¶ 8. Thus, construing the facts in a light most favorable to Plaintiff Dale Schade, the Court concludes that there remains a genuine issue about whether Dale Schade was detained during the search. *Michigan v. Summers*, 452 U.S. 692, 696, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (holding that a seizure occurred where respondent was not free to leave the premises during search).

### 2. Assuming Schade Was Detained, Was His Detention Nevertheless Lawful?

Defendants Meyer and Birchim argue that even if Dale Schade was detained, they are nevertheless entitled to Summary Adjudication, because the detention was reasonable under *Michigan v. Summers*. In *Summers*, the Supreme Court held that "for Fourth Amendment purposes ... a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705, 101 S.Ct. 2587 (footnotes omitted). Such a detention serves important government interests, such as "prevent[ing] flight in the event incriminating evidence [is] found, ... minimiz[ing] the risk of harm to the officers, and ... further[ing] the orderly completion of the search." *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003).

■ However, "[t]he scope of a detention must be carefully tailored to its underlying justification." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Although a mere detention (without more) would be tailored to the interests suggested above and would "work no great invasion of privacy" *id.* at 1120, an involuntary interview during the search renders the detention more intrusive than necessary, *id.* at 1122, because the law enforcement interests in controlling the premises during the search are not furthered by "condition[ing] the [detainee's] release on [his] submission to interrogation." *Id.* at 1120–21. In *Ganwich*, the Ninth Circuit held that a deten-

---

**12.** Schade is not asserting this claim against any of the other Defendants in this action.

Index of Plaintiffs' Claims No. 4.

tion during a search violated the detainees' Fourth Amendment rights when the officers held them in a waiting room, prevented them from going to the restroom unattended, prevented them from retrieving their personal possessions, prevented them from using or answering the telephone and told them that they would not be released until they submitted to individual interviews with police in a back room. *Id.* at 1118.

 Here, Schade remained on his property during the entire search, which lasted approximately three hours. Mot. (Birchim Decl.) ¶ 17; Mot. (Meyer Decl.) ¶ 18. While the search was underway, he was interviewed by Birchim and Meyer in his dining room for approximately two and a half hours. Opp. (Schade Decl.) ¶ 8. Schade does not dispute Birchim and Meyer's claim that he consented to the interview. Mot. (Birchim Decl.) ¶ 12; Mot. (Meyer Decl.) ¶ 14. According to a transcript of the tape-recorded interview, Schade stated "I will give you everything I've got," in response to Meyer's statement that he and Birchim wanted to ask him about his relationship with Williams. Reply (Meyer Decl.) ¶ 2. Schade also does not dispute that during that interview he was told he could make and receive phone calls. Mot. (Birchim Decl.) ¶ 13. Nor does he dispute that on several occasions he helped himself to water from the kitchen, made coffee which he served to Birchim and Meyer and was permitted to complete doing a laundry. Mot. (Birchim Decl.) ¶ 16; Mot. (Meyer Decl.) ¶ 17. Additionally, and unlike in *Ganwich*, Schade makes no claim that Birchim and Meyer told him that he would not be released until he submitted to an interview. On these facts, Defendants Birchim and Meyer did not exceed the bounds of reasonableness imposed by

*Summers* and *Ganwich*. Therefore, if *Summers* and its progeny apply to this case, Birchim and Meyer would be entitled to Summary Adjudication on Dale Schade's unlawful detention claim.

However, the matter is more complicated, because the Court has held that the warrant Birchim and Meyer relied on was invalid. In *Summers*, that the police had obtained a *valid* warrant was central to the Court's holding. The Court noted that whether the police obtained a valid warrant is "[o]f prime importance in assessing the intrusion" that a detention engenders. *Summers*, 452 U.S. at 701, 101 S.Ct. 2587. This is so, because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 701 n. 13, 101 S.Ct. 2587 (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Where "a neutral magistrate rather than an officer in the field" has found probable cause to authorize such an invasion, *id.* at 703, 101 S.Ct. 2587, the "less intrusive," *id.* at 701, 101 S.Ct. 2587, detention of a resident during the search, "although admittedly a significant restraint on his liberty," *id.*, is "constitutionally reasonable." *Id.* at 705, 101 S.Ct. 2587. Here, the warrant that Birchim and Meyer were relying on when they detained Dale Schade was not valid, so it would appear that *Summers* does not apply. *See Marks v. Clarke*, 102 F.3d 1012, 1032 (9th Cir.1997) (*Summers* does not authorize detaining persons in furtherance of an illegal search).

However, qualified immunity entitles Birchim and Meyer to rely on the warrant if their reliance was "objectively reasonable." *See United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).[13] In *Ramirez v. Butte–Silver Bow*

---

**13.** Although *Leon* was a decision about the exclusionary rule, *Leon*, 468 U.S. at 922, 104 S.Ct. 3405 ("[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on

*County,* 298 F.3d 1022 (9th Cir.), *cert. granted,* — U.S. ——, 123 S.Ct. 1354, 155 L.Ed.2d 195 (2003), the court stated that officers who lead a team that executes a search warrant must read the warrant and "satisfy themselves that they understand its scope and limitations, and that it is not defective in some obvious way." *Id.* at 1027 (citing *Leon,* 468 U.S. at 922–23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). Officers who participate in the search but who are not in charge need not read the warrant; they need only inquire about "the nature, scope and details of the warrant." *Marks,* 102 F.3d at 1030 (9th Cir.1997). The Court is aware of no case requiring that an officer who executes a facially valid warrant have read the affidavit. Indeed, in the *Marks* opinion, there were no facts presented to suggest that several of the officers who conducted the search received anything more than an oral briefing about what they were to be looking for. *Id.* at 1019–20. Yet the Ninth Circuit held that the district court had erred in holding that qualified immunity required additional inquiries by those officers. *Id.* at 1029–30.

It is undisputed that neither Defendant was involved in any of the actual searching that occurred at the Schades' residence, Mot. (Birchim Decl.) ¶ 21; Mot. (Meyer Decl.) ¶ 22, and Plaintiffs do not allege that Birchim or Meyer were in charge of the expedition. Even if they were in charge, the undisputed evidence demonstrates that they satisfied their *Marks* and *Ramirez* duties. Both Birchim and Meyer declare

that they were "informed of the nature and scope of the warrants" and that they read the warrants before the search. Mot. (Birchim Decl.) ¶¶ 5, 8; Mot. (Meyer Decl.) ¶¶ 7, 10. Each declares that he was "satisfied that [he] understood [the warrant's] scope and limitations" when the search took place. *Id.* ¶ 10; Mot. (Birchim Decl.) ¶ 8. Because there was nothing obviously defective about the warrant [14] (as opposed to the Affidavit [15]), under *Summers* Birchim and Meyer were entitled to believe that the search warrant authorized them to detain Dale Schade incident to the search.

**D. *Defendants Burridge and Standley are Not Entitled to Summary Judgment Regarding their Searches of Lia Schade's Office, Car. Purse and Day Planner.***

"[A] citizen has no right to resist a search or seizure pursuant to a warrant." *Gasho v. United States,* 39 F.3d 1420, 1432 n. 12 (9th Cir.1994). And, for the reasons discussed in Section IV.C.2, *supra,* when SBSD officers Burridge and Standley searched Lia Schade's office, purse, day planner and vehicle, they were entitled to believe that the warrant they possessed was valid. However, to rely on a warrant as authority to search, the Fourth Amendment requires an officer to serve the warrant on the suspect so that the suspect has notice of what the officer is entitled to seize. *United States v. Gantt,* 194 F.3d 987, 995 (9th Cir.1999) (citing

---

a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."), the Ninth Circuit has applied it in the context of qualified immunity. *Ramirez v. Butte–Silver Bow County,* 298 F.3d 1022, 1027 (9th Cir.2002), *cert. granted,* — U.S. ——, 123 S.Ct. 1354, 155 L.Ed.2d 195 (2003) (citing *Leon* ).

14. Although the warrant was overbroad because it listed items to be searched or seized

that were not supported by probable cause, *see* Section IV.A.3 *supra,* a reasonable officer who was not familiar with the Affidavit would not have learned this by reviewing the warrant alone.

15. The Schades do not contend either that Birchim or Meyer had read the Affidavit or that their actions reveal an awareness of the Affidavit's contents.

*United States v. McGrew,* 122 F.3d 847, 850 (9th Cir.1997)). Burridge and Standley did not serve the warrant on Lia Schade. Therefore, they cannot rely on the warrant to justify their actions.

The officers argue that their search of Lia Schade nevertheless comported with the Fourth Amendment, because they contend that Lia Schade consented to it. Where an officer does not rely on a warrant, the search may nevertheless be lawful if the subject consented to the search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When an officer "seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *United States v. Koshnevis,* 979 F.2d 691, 694 (9th Cir.1992) (quoting *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)). The Court finds that there is a genuine issue about whether Lia Schade freely consented to the search.

 In *Bumper,* the Supreme Court held that where a homeowner consented to a search of her house only after the officer represented that he had a warrant, the homeowner's consent was invalid. *Bumper,* 391 U.S. at 548, 88 S.Ct. 1788. The Court explained: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion-albeit colorably lawful coercion. Where there is coercion, there cannot be consent." *Id.* at 550, 88 S.Ct. 1788. "It is well established that there can be no effective consent to a search or seizure if that consent follows a law enforcement officer's assertion of an independent right to engage in such conduct." *Orhorhaghe v. INS,* 38 F.3d 488, 500 (9th Cir.1994). In *Orhorhaghe,* the Ninth Circuit found that "*Bumper* ... stands for the proposition

that a consent is ineffective if it follows 'an express or implied claim by the police that they can immediately proceed to make the search in any event.'" *Orhorhaghe,* 38 F.3d at 501 (citation deleted).

 When assessing qualified immunity, the Court must assume the facts in Lia Schade's favor and then determine whether it would be clear to a reasonable officer that his conduct was unlawful. *Estate of Ford v. Ramirez–Palmer,* 301 F.3d 1043, 1045 (9th Cir.2002). Here, Lia Schade has declared that Burridge and Standley informed her that they had a warrant to search her "office, purse day planner, etc.," Opp. (L. Schade Decl.) ¶ 4, and testified that those officers told her that search warrants were executed at her home. Reply Exh. GGG at 69:9–10, 70:11–14 (L. Schade Depo.). She also testified that she consented to the searches, because "[b]efore [Burridge and Standley] started the [taped portion of the interview], they talked about the general order 77–1, or whatever the number is. And there is a big sign posted as you drive into the [SBSD] campus. It says anything subject to search upon request. I felt I had no choice." *Id.* at 69:10–14. Therefore, construing the evidence in a light most favorable to Lia Schade, Lia Schade cooperated with the officers after they (a) told her that search warrants had been executed at her home; (b) told her that they had a warrant to search her office, purse, car and day planner; and (c) reminded her of an SBSD rule, posted on a sign at the entrance to the campus, warning all visitors that they and their property are subject to search. Given that it was clearly established at the time that a consent is invalid if it was given after the officer told the subject that he had authority to search regardless of whether the subject consented, Burridge and Standley are not entitled to qualified immunity, because there is a

genuine factual issue about whether their statements to Lia Schade indicated that they did not require her consent.[16]

### E. The Schades' Conspiracy Claims.

The Schades allege that Defendants Birchim, Means, Palera, Olmstead, Hermreck, Gracey, Dollar, Cintron, Swopes, Julie McCammon and Auchincloss conspired with Means to obtain a warrant lacking probable cause. Index of Plaintiffs' Claims ¶ 3. Dale Schade alleges that those same defendants conspired with Means to obtain a warrant via misrepresentations in the Affidavit. *Id.* ¶ 1. "To establish ... liability for a conspiracy, [Plaintiffs] must demonstrate the existence of an agreement or 'meeting of the minds' to violate constitutional rights." *Mendocino Environmental Ctr. v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir.1999) (quoting *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540–41 (9th Cir.1989) (en banc)). The defendants must have, "by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in. damage." *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999). Each alleged participant in the conspiracy "need not know the exact details of the plan, but ... must at least share the common objective of the conspiracy." *Mendocino,* 192 F.3d at 1302. Plaintiffs need not provide direct evidence of the agreement between the conspirators; what is required is circumstantial evidence sufficient for a jury to "infer from the circumstances (that the

alleged conspirators) ... reached an understanding to achieve the conspiracy's objectives." *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.), *rev'd on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (quoting *Adickes v. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). *See also Mendocino,* 192 F.3d at 1301.

### 1. Conspiracy to Obtain a Warrant Unsupported By Probable Cause

The Schades claim that the SBC Defendants conspired to obtain a warrant based on an Affidavit unsupported by probable cause. This claim depends. on the notion that any reasonable officer who read the Affidavit would have had reason to know that it did not present probable cause for a warrant directed at the Schades. If a Defendant read the Affidavit and did not raise any concerns, a reasonable jury could infer that the defendant reached an "understanding" with Means to obtain the warrant despite its invalidity.

Of the Defendants who brought this motion, Plaintiff's evidence shows that only Palera and Auchincloss reviewed the Affidavit. Palera testified that Means asked him to review the Affidavit and that he—Palera—provided no comments. Opp. Exh. W at 71:4–24 (Palera Depo.). Auchincloss testified that he was asked to provide input about "form [and] probable cause," and that he cannot remember whether he had any comments. Opp. Exh. EE at 15:9–11, 16:7–16 (Auchincloss Depo.). Therefore, because a reasonable officer (or district attorney, in Auchin-

---

16. Defendants' counsel blithely assert, in conclusory fashion, that Lia Schade's testimony about her belief concerning the sign on the SBSD campus "confirms she had no expectation of privacy." Reply at 25 n. 12. This is an inadequate rejoinder to the cases plaintiffs cite in arguing that government employees can have a reasonable expectation of privacy in their workplace against intrusions by police and that Lia Schade's office was not "so open to fellow employees or the public that no expectation of privacy [was] reasonable." *O'Connor v. Ortega,* 480 U.S. 709, 717–18, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality op.). *Accord United States v. Jones,* 286 F.3d 1146, 1150 (9th Cir.2002) ("[A] public employee has a reasonable expectation of privacy in her workplace office.").

closs's case) would have realized upon reviewing the Affidavit that there was no probable cause for the issuance of the warrants as to either Dale Schade or Lia Schade, and there is evidence that neither Palera nor Auchincloss raised a concern about it, there remains a genuine issue regarding whether Palera or Auchincloss conspired with Means to procure a facially defective warrant as to Dale Schade and Lia Schade.

 However, neither of the Schades has proffered sufficient evidence for a reasonable jury to infer that any of the other SBC Defendants conspired with Means in that manner. They have not proffered any evidence that any of the remaining defendants ever saw the Affidavit. Moreover, evidence was assembled from myriad sources and locations during the more than four year investigation. For example, evidence was obtained from background checks, public records, Andalon's observations, "trash runs" at the residences of all Plaintiffs, trash delivered by Andalon, and surveillance in California and Arizona. Defendants Olmstead, Hermreck, Gracey, Dollar, Cintron and Swopes were assigned to perform discrete tasks and report back on what they had found. The Schades have proffered no evidence that any of these individuals mis-reported what they observed or discovered, nor that any of these individuals knew what evidence had been uncovered in other facets of the investigation. For example, while it is clear that Hermreck had extensive knowledge of Andalon's observations, there is no evidence that she knew anything about what may have been uncovered about the Schades through records searches, trash runs and the like. Thus, there is no evidence on the basis of which a reasonable jury could infer that any of these individuals shared a common objective with Means to obtain a facially invalid warrant. Accordingly, the Court GRANTS summary adjudication to Defendants Olmstead,

Hermreck, Gracey, Dollar, Cintron and Swopes on the Schades' claim that they conspired to procure warrants lacking probable cause.

Similarly, based on the evidence before the Court, no reasonable jury could infer that Defendants Birchim or McCammon conspired with Means to obtain a warrant based on a facially invalid affidavit. Birchim was the lead investigator on the case between March 1998 and November 1998. Reply SGI ¶ 171; Mot. (Birchim Decl.) ¶ 3. Plaintiffs have not proffered any evidence to challenge his assertion that after November 1998, he was not involved in the investigation until he was asked to interview Dale Schade when the warrants were finally executed. *Id.* There is also no indication that Birchim ever reviewed the Affidavit before if was submitted to the magistrate. Accordingly, there is no basis to infer that Birchim conspired with Means.

Nor is there evidence that Julie McCammon, whose accounts of her discussions with Williams and Dale Schade appear in the Affidavit, conspired with Means to procure a warrant lacking probable cause to search Dale or Lia Schade. There is no evidence that Julie McCammon ever told Means anything about Lia Schade or that she had any knowledge about what other information had been uncovered regarding Lia or Dale Schade. The uncontroverted evidence indicates that the only portions of the Affidavit McCammon saw were those portions referring to her own or her husband's observations. Mot. (Means Decl.) ¶ 27.

The Court therefore GRANTS Birchim's and McCammon's motion for summary adjudication on this conspiracy claim.

### 2. Conspiracy to Obtain a Warrant By Including Misleading Information in the Affidavit.

The Court has held that Defendant Means is not entitled to qualified immunity

on Dale Schade's *Franks v. Delaware* claim. *See* Section IV.B, *infra.* Other Defendants may be liable if Dale Schade shows they conspired with Means to obtain the warrant using misleading information. To make out at least a circumstantial case that a Defendant conspired with Means in that manner, Dale Schade would have to show that the Defendant knew that Means was proffering evidence from Andalon that was stale and that the Defendant failed to correct the Affidavit or actually aided Means in drafting it.

As noted above, only two of the Defendants who brought this motion—Defendants Palera and Auchincloss—reviewed the Affidavit. Palera also gathered information from Andalon. He testified that early in the investigation, his role was to "stay in contact with [Andalon]" and relay information Andalon had provided to Birchim. Opp. Exh. W at 51:13–17 (Palera Depo.). He also testified that he met with Andalon "numerous times" while he was assigned to North County Narcotics, *id.* at 12:19–13:17, and gathered trash Andalon had collected from Williams's residence. *Id.* at 35:21–36:1. Given that Palera was personally familiar with Andalon's reporting and thereafter reviewed the Affidavit, there remains a genuine issue about whether a jury may find that he conspired with Means to omit the facts tending to show that the information derived from Andalon was stale. However, although Defendant Auchincloss reviewed the Affidavit, he is entitled to Summary Adjudication, because there is no evidence proffered by the Plaintiffs tending to indicate that Auchincloss knew that the evidence derived from Andalon was stale.

The other SBC Defendants are entitled to Summary Adjudication on this conspiracy claim. Defendant Julie McCammon is entitled to Summary Adjudication, because Plaintiffs have proffered no evidence that

she intentionally misrepresented information she relayed to Means when she told him that she believed that Schade and Bullard were friends. *See* Section IV.B, *infra.* The remaining SBC Defendants are entitled to Summary Adjudication, because Plaintiffs have not proffered any evidence that they ever saw the Affidavit or intentionally mis-represented anything they uncovered in the course of their individual investigative tasks.

## V.

## CONCLUSION

For the foregoing reasons, the SBC Defendants' Motion for Summary Judgment [17] against Dale and Lia Schade is GRANTED in part and DENIED in part. The Court's specific rulings are as follows:

1. On the face of the Affidavit there was no probable cause to search the Schades' residence, their vehicles, Lia Schade's office, purse, personal day planner or the Schades themselves. Accordingly, Defendant Means is not entitled to qualified immunity regarding the facial validity of the warrant.

2. Defendant Means is not entitled to qualified immunity on Dale Schade's *Franks v. Delaware* claim. Defendant Julie McCammon is entitled to qualified immunity on that claim. All other SBC Defendants are entitled to Summary Adjudication on that claim.

3. Defendants Birchim and Meyer are entitled to Qualified Immunity regarding Dale Schade's purported detention during the search of his residence.

4. Defendants Burridge and Standley are not entitled to qualified immuni-

17. Docket No. 261.

ty regarding their searches of Lia Schade's office, car, purse and day planner.

5. As to both Dale Schade and Lia Schade, there is a genuine issue about whether Defendants Palera and Auchincloss conspired with Means to procure a defective warrant lacking probable cause. There is also a genuine issue about whether Palera conspired with Means to omit material evidence from the Affidavit in violation of the *Franks* doctrine. All other SBC Defendants are entitled to Summary Adjudica-

tion on the Schades' conspiracy claims.

6. The SBC Defendants are entitled to Summary Adjudication on Lia Schade's unlawful detention claim, Dale Schade's First Amendment claim, the Schades' property damage claim, the Schades' retention of property claim and the Schades' claims regarding Andalon's activities, since the Schades have now acknowledged that they are no longer asserting these claims against the SBC Defendants.

IT IS SO ORDERED.

## APPENDIX A
### REFERENCES TO DALE OR LIA SCHADE IN THE AFFIDAVIT

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| | | Personal/Business Relationship with Williams | | |
| "Lia Schade has a close personal relationship with Williams and has received cash gifts and favors from Williams." | Aff't at 7. | Opp. Exh. F at 248 (Means interview with Andalon). | 1. No evidence of "cash gifts." |
| | | | | 2. SBSD surreptitiously recorded a conversation between J. McCammon and Williams on 10/13/99 in which Williams stated that he and Lia "had some disagreements" and "think a lot different." Williams explained that Lia had expressed concerns to Williams about Williams and Dale Schade's relationship. Reply Exh. ZZZ at 358 (Investigative Report Prepared by Means); Reply (J. McCammon Decl.) ¶ 8. |
| | | | | 3. Andalon reported the "close personal relationship" on 1/6/99. No evidence of contact between Lia Schade and Williams after 2/26/99 when an entity |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| | | | | controlled by Williams issued a $60 check to her. Reply Exh. NNNN at 454–55 (Swopes Memo re evidence recovered from trash). The last reported trip with Williams involving Lia occurred in 7/98. Opp. Exh. F at 193 (Hermreck interview with Andalon). |
| "Williams has developed a business and personal relationship with Robert Dale Schade and Lia Zanesco Schade." | | Aff't at 14. | | |
| "Dale and Lia Schade had open access to the Williams property and have visited the residence while Williams is at home and away." | | Aff't at 14. | Opp. Exh. F at 172, 173 (Birchim interview with Andalon) | The Aff't conceals that the evidence supporting this statement was stale. Andalon reported this on 3/25/98. Opp. Exh. F at 172, 173.<br><br>As of 7/98, Hermreck was filing reports every few days regarding Andalon's observations. Opp. Exh. F at 186.1–218. By 10/98, Hermreck filed such reports nearly every day until the warrants were executed. Opp. Exh. F at 220–272, 289–305, 323, 329, 335–339, 344–345, 369–373, 380–387, 390–92, 412–13, 428, 432–34, 443–56, 464–76, 483–86, 495–98, 505, 520–21, 543–49. *See also* Aff't at 9 ("Hermreck has contact with [Andalon] on a daily basis"). Andalon's observations about the mundane comings-and-goings of suspects to and from the Williams residence appear to have been meticulously recorded. The only observations mentioning Dale or Lia Schade during that period were: |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| | | | | (1) *7/12/98:* Williams and the Schades' trip to Europe. (2) *4/19/99:* Williams told Andalon that Dale Schade would be checking on the house and possibly spending the night while Williams would be away. (3) *7/30/99:* Williams called D. Schade and asked Schade when he would be ready for "the trip to Arizona." |
| "[Andalon] indicated that Dale Schade would come to the Williams residence or Williams would contact Dale Schade, by telephone or in person, on a daily basis during Schade's tenure as the Commander of the Santa Ynez Valley Sheriff's Substation." | | Aff't at 14. | Opp. Exh. F at 172, 173 (Birchim interview with Andalon) ("Dale is at David's house all the time." . . . "Dale started coming to David's house three years ago."); Reply Exh. AAA at 33:2–3 (Birchim Depo.) (reporting Andalon told him that "Dale [Schade] comes [to Williams's] house a lot during the day . . . drinks and goes or stays.") | The Aff't conceals that the evidence supporting this statement was stale. It does not state that Schade ceased being Commander of the Substation in May 1998 (Mot. Exh. X at 19:4–14 (D. Schade Depo.); Reply Exh. LLL at 163:15–164:2 (D. Schade Depo.))—about 19 months before the warrant was sought. Similarly, the Aff't also does not reveal that Andalon reported D. Schade's frequent visits on 3/25/98. Opp. Exh. F at 172, 173. |
| "[Julie] McCammon said that Williams stopped by the Santa Ynez Substation periodically to visit with [Dale] Schade." | | Aff't at 21. | | Stale evidence. Aff't does not reveal that Schade ceased working at the Santa Ynez Substation in May 1998. Mot. Exh. X at 19:4–14 (D. Schade Depo.); Reply Exh. LLL at 163:15–164:2 (D. Schade Depo.). |
| "[Andalon] told [Means] she believes [Dale] Schade has supported Williams' suspicious activities by using Schade's Law Enforcement influence. . . . [Andalon] believes . . . that Schade would protect Williams from other Depu- | | Aff't at 15. | Opp. Exh. F at 248 (Means interview with Andalon) (Dale Schade served "as an information tool for law enforcement activities.") | |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| ties in the Santa Ynez Valley." | | | | |
| **Williams's Generosity** | | | | |
| "Your affiant discovered that Williams paid for a recent trip to Europe for [Dale] Schade and his wife." | none reported | Aff't at 7, 14, 56. | Opp. Exh. F at 193 (Hermreck interview with Andalon). | Characterizing that trip as "recent" is misleading. Andalon reported the trip on 7/12/98. Opp. Exh. F at 193. |
| "Your affiant discovered that Williams has given cash gifts to [Dale] Schade and provided him with a credit card." | none reported | Aff't at 7. | Opp. Exh. F at 173 (Birchim interview with Andalon) (Williams gave Dale and Lia Schade credit cards for Christmas). | (1) No evidence of "cash gifts." |
| "[Andalon] told your affiant that she had seen Williams provide credit cards to the Schades. . . . Your affiant has discovered receipts and documents [in the] Schades' discarded trash showing use of credit cards in the name of Williams and Williams' companies. Your affiant believes a number of American Express cards, which Williams pays, have been given . . . Dale and Lia Schade." | | Aff't at 32 | Opp. Exh. F at 173 (Birchim interview with Andalon). | Andalon reported the credit card gift on 3/25/98. Aff't does not indicate when Means discovered the receipts. |
| **Packages** | | | | |
| Non–Specific Packages Allegations "[Andalon] told [Means] that Dale Schade, while employed with the Sheriff's Department, picked up or delivered packages for Williams once or twice a month. [Andalon] indicated that Schade's participation in the package deliver- | | Aff't at 14. | Opp. Exh. F at 248 (1/6/99 Means interview with Andalon); Reply Exh. DDD (Palera Depo.) at 14:1–20; Reply at 12. | 1. Andalon did not say "once or twice a month." Means's report indicates she said: "[Dale Schade] has been at the residence on numerous occasions and has helped [Williams] move 'special packages.'" Opp. Exh. F at 248. Ambiguous whether this sentence means that Schade moved packages "numerous times" |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| ing and retrieval was not constant but occasional." | | | | or whether it just means that Schade has been at the residence numerous times and had occasionally moved packages. |
| Andalon represented that "Schade has delivered and escorted other suspicious packages for Williams many times. On several occasions Schade has met Williams at the residence and assisted him in loading suspicious packages." | | Aff't at 15. | Opp. Exh. F at 248 (1/6/99 Means interview with Andalon) | 2. Andalon's accounts were stale. Means's interview with Andalon occurred on 1/6/99 (and in that interview, she was recounting to him everything she had ever observed regarding Williams going back to 1996); Andalon spoke with Palera before 3/98.

3. In a 3/3/99 internal briefing, Means reported that "Schade's trips to [Williams's] house are fairly infrequent." Opp. Exh. F at 280. |
| Andalon represented that "[o]n one occasion . . . [Dale Schade came to Williams's residence and] loaded a heavy ice chest" onto his vehicle and would not allow Andalon to touch the chest. | undated | Aff't at 15 | Opp. Exh. F at 186.2 (6/18/98 Cintron interview with Andalon). | This undated incident with the ice chest was reported by Andalon on 6/18/98 and she represented that the incident occurred on 5/31/98. Opp. Exh. F at 186.2. The Aff't also omitted that Schade loaded the ice chest on the morning after Williams hosted a party to celebrate Dale and Lia Schade's anniversary. The ice chest had been delivered to the house on the day before the anniversary party. Opp. Exh. F at 186.2 |
| Dale Schade collected a "special package" from Williams' residence and took it to Arizona where he met Williams. | late March or early April 1998 | Aff't at 15 | Opp. Exh. F at 173 (Birchim interview with Andalon). | Birchim's interview notes indicate that Andalon made this representation on 3/25/98 and that she had stated that this had occurred "last year." Thus, Andalon represented that Dale collected the "special package" sometime in 1997, not in March or April of 1998. |
| Means discovered a guest card and | 3/29/98 to 4/1/98 | Aff't at 15. | | |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| bill from The Phoenician resort in Phoenix, AZ in the Schades' trash. The guest name on both documents was "M/M Clyde Cessna," a party of two, and the room was billed to a credit card issued to Williams. The arrival date was 3/29/98 and the departure date was 4/1/98. Means telephoned the Phoenician and learned that Williams had stayed there during the same period. | | | | |
| "[Andalon] told [Means] about an occasion in March 1998, when Williams exchanged a duffel bag with Paul at Williams' residence. Paul loaded the duffel bag into his vehicle. Williams then contacted Schade via a cellular telephone that also had radio capabilities. Williams was overheard asking Schade if it was safe for Paul to leave. Schade was overheard telling Williams everything was ready and it was safe for Paul to leave." | 3/98 | Aff't at 16. | | |
| **1996 Traffic Accident** | | | | |
| In July 1996, Williams called Daniel and Julie McCammon (SBSD officers) and told them he had been involved in a car | 7/28/96 | Aff't at 19–21. | Reply Exh. DDDD at 25:17–19, 27:4–10, 27:25–28:12 (J. McCammon Depo.). | Schade and Bullard are not "close personal friends." Opp. (Bullard Decl.) ¶ 2 ("I had very little contact with [D. Schade]. We were not friends."). |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| accident that day, that he had left the scene of the accident, and wanted Daniel McCammon to talk to the investigating officer to tell him that Williams is "a good guy." Daniel McCammon refused to do so. The investigation of the accident revealed that Williams had been driving in excess of 115 mph and had been under the influence of alcohol. Julie McCammon later asked Schade whether Schade knew Williams was involved in an accident. Schade responded that he had "taken care of Williams." Williams later pled nolo contendere to significantly reduced charges regarding the accident. Julie McCammon told Means she knows that Schade and the Deputy DA Bullard (the attorney responsible for prosecuting the case) "are close personal friends." | | | | |
| "[Means] knows through years of employment within the [SBSD] that . . . Bullard is a close associate and personal friend of Dale Schade. Your affiant believes that Schade used his professional and | | Aff't at 22. | Means based his belief that Bullard and Schade were friends on what McCammon told him, that he had seen them "in conversation," and that Sam Gross had told him that they were friends. Reply Exh. DDDD at 36:1–18, 38:8–13 (J. McCammon Depo.); | |

| Incident | Date (as Reported in Aff't) | Reference in Affidavit | Supporting Evidence Upon Which Means Allegedly Relied | Schades' Response |
|---|---|---|---|---|
| personal association with . . . Bullard to influence the prosecution of Williams for the accident. Your affiant bases this belief on the information from [Julie] McCammon, and the fact that . . . Bullard . . . has a reputation of strict prosecution regarding alcohol-related accidents." | | | Reply Exh. BBB at 391–92 (Means Depo.) | |
| Schade obtained a $10,000 mortgage loan from Vandenberg Federal Credit Union on April 3, 1996. He received a full reconveyance of the property securing the loan on August 28, 1996—about 5 months after receiving the loan and one month after the accident. | | Aff't at 22–23. | | |